# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 74

### APRIL TERM, A.D. 2013

### June 17, 2013

NICHOLAS M. MONTEE,

Appellant
(Defendant),

v.

No. S-12-0166

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*

> *Diane M. Lozano, State Public Defender; Tina N. Olson, Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel.*

*Representing Appellee:*

> *Gregory A. Phillips, Attorney General; David L. Delicath, Deputy Attorney General; Theodore R. Racines, Senior Assistant Attorney General; Darrell D. Jackson, Director, Emily N. Thomas, Student Director, and Shaina A. Case, Student Intern, Prosecution Assistance Program, University of Wyoming, College of Law.*

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Justice.**

[¶1]    Nicholas M. Montee was convicted of second degree arson.  His claim on appeal is that there was insufficient evidence to support his conviction.  We conclude that the evidence was sufficient, and we will affirm.

### *ISSUE*

[¶2]    Mr. Montee presents a single issue: Was there sufficient evidence to support a conviction of second degree arson?  The State presents the same issue with more elaboration:

> Under Wyo. Stat. Ann. § 6-3-102(a), a person is guilty of second degree arson if he starts a fire with intent to destroy or damage property to collect insurance.  At trial, the State presented evidence that Mr. Montee admitted he started a fire in his late mother's house, which he stood to inherit. Moreover, the State offered circumstantial evidence showing he intentionally started the fire to collect insurance proceeds. Did the State provide sufficient evidence for a reasonable jury to find Mr. Montee guilty?

### *FACTS*

[¶3]    Mr. Montee's mother died in 2010.  He and his brother were her only heirs, and he was appointed personal representative of her estate.  The estate's most valuable asset was a home located on several acres in rural Laramie County.  Mr. Montee had lived there with his family all of his life, and continued to consider it his place of residence after his mother died, although he was living with his fiancée in Cheyenne at least part of the time.

[¶4]    When Mr. Montee testified at his trial, he explained that, after his father's death in 2001, his mother began to "hoard everything."  As he described it, "She just would buy and buy and gather stuff and stick it everywhere."  As a result of the home's poor condition, an appraiser for the estate determined that it had essentially no monetary value. The real estate was worth up to $49,000.  There was a mortgage on the property for approximately $13,000.  Because the estate had limited liquidity, Mr. Montee advanced more than $8,000 from his own assets to pay the estate's expenses, including mortgage payments.

[¶5]    On the afternoon of February 13, 2011, a neighbor saw smoke coming from the Montee home, and called to report it.  One of the responders contacted Mr. Montee to inform him of the fire.  When Mr. Montee arrived, he told the responder that he had been at the home about an hour before the fire was reported.  He also told the responder that

1

the insurance policy on the home had lapsed, but that he had just recently renewed it. After the fire was controlled, because the firefighters suspected arson, they assigned "somebody to baby-sit the scene overnight to make sure it wasn't tampered with."

[¶6]    Detective Thomas of the Laramie County Sheriff's Department, a certified fire "origin-and-cause technician," was assigned to investigate the cause and origin of the fire. He detailed the results of his investigation at trial. His initial impression was of "a home severely damaged by a fire," and he was "also struck by the amount of household goods and clothing and things that were accumulated in the home."

[¶7]    Detective Thomas's investigation eliminated several possible causes of the fire. He ruled out natural causes such as lightning because the weather on the day of the fire had been dry and windy with no precipitation. The propane supply to the Montee home had been shut off for several months, so he ruled out an accidental gas fire. He found no evidence that it was an electrical fire. He ruled out the electrical space heaters as sources of the fire because there was no burn pattern on the floor underneath them. Having ruled out these accidental causes, Detective Thomas began to suspect that the fire was set intentionally.

[¶8]    Detective Thomas explained to the jury the evidence suggesting arson. Evidence of petroleum distillates was found in one of four samples taken from the home, although the exact nature of the material was not determined. Examining the property around the Montee home, Detective Thomas noted a detached storage shed with a "cluster of fishing poles laying beside it." He explained that it was significant to find "fishing poles in February outside of a shed rather than inside" because "one of the flags of an intentionally started fire is that a person gets valuable items out of the structure before they burn it." Inside this shed, he found firearms "laid on the floor, kind of on top of each other. Generally," he explained, "firearms are stored respectfully in some way where they're not laying on top of each other. Again, this appeared to be a hurried gathering . . . similar to the fishing poles." Other factors suggesting arson to Detective Thomas included the isolated, rural location, and the fact that a new insurance policy on the home had been purchased shortly before the fire. As Detective Thomas explained, none of these factors by itself proved arson, "but if you accumulate several factors in the course of your investigation that could become significant."

[¶9]    Detective Thomas also testified that Mr. Montee was the last person known to be at the home, and he had been there within an hour of when the fire was reported. There was evidence that Mr. Montee was experiencing financial difficulties, including the fact that he had been on leave from his job without pay since August, 2010. Mr. Montee was frustrated by the condition of the home and the amount of work he was required to do to clean up the property.

[¶10]    In April, 2011, Detective Thomas and another detective interviewed Mr. Montee

2

for nearly four hours. That interview was recorded, and the recording was played in its entirety for the jury during trial. Mr. Montee described various medical problems he had experienced, and related his financial difficulties, admitting that he had considered contacting a bankruptcy lawyer. He confirmed that he had been at the home on the day of the fire, and explained he went there to feed the dogs and look for a knitting machine he believed to be in his mother's bedroom. He left around 2 o'clock in the afternoon, and received the phone call about the fire approximately an hour later. Mr. Montee said that he would "accept responsibility for possibly accidentally starting it," adding, "I'm the only one there . . . I'm the one that had to have done it."

[¶11] He then said that, if he had started the fire, "it started in the kitchen because I know I touched that stove." Later, he said he thought he had turned on the stove. Then he admitted, "I'm positive I turned it on." He also said that there were papers and other items on and near the stove when he turned it on.

[¶12] When asked why he had turned the stove on and left the house, Mr. Montee explained, "There would be so many reasons. . . . I didn't care anymore. I didn't want to deal with it anymore." He also said he "wanted this house to go away." He later told the detectives, "I will accept responsibility . . . for the house burning down. I will accept that responsibility," and explained, "I know I turned the stove on, and I know I said 'screw it.'" Later, he reconfirmed, "I know I turned on the stove, and I walked out." The detective asked, "And you knew it would start the house on fire?" Mr. Montee responded, "I'm positive. I knew that it would."

[¶13] However, even though Mr. Montee admitted to starting the fire in the kitchen, he consistently maintained throughout the interview that he had not started a fire in his mother's bedroom closet. Detective Thomas testified that his initial hypothesis was that the fire had started on the west end of the house in the mother's bedroom closet. After interviewing Mr. Montee, however, the detective

> went back and investigated the second location in the kitchen more firmly, found confirming evidence . . . there were two locations where the fire started.
>
> One of the factors in an arson is multiple starts because they want to make sure it burns down, so it is logical in an arson fire there are more than one start locations, and both appear to be start locations.
>
> I gave the kitchen more credence, ultimately, because he confessed to starting the fire there. He did not confess to starting the fire in the bedroom. . . .

3

> I felt that I had concluded rightfully that he had committed the arson, and just because he wouldn't confess to both locations didn't mean that a crime wasn't committed.

As a result of his investigation, Detective Thomas concluded that the fire started "on the cooking surface of the island in the kitchen," with a possible secondary point of origin in the mother's bedroom closet.

[¶14] Another witness who testified at Mr. Montee's trial was Rick Baldwin, a fire and explosives investigator for the insurance company that had recently insured the Montee home. The conclusions of his investigation were largely consistent with Detective Thomas's conclusions. For example, he said there was no lightning or other weather phenomenon that could have started the fire, though there had been high winds the day of the fire. He found no signs of the fire starting near the space heaters. He ruled out electrical wiring, switches, appliances, and other heat-producing equipment as causes of the fire. He also thought it unusual to find a number of fishing rods and reels outside in the wintertime, and further noted that he found no dust or grass or leaves on the fishing equipment, suggesting they had not been outside for long. Like Detective Thomas, Mr. Baldwin concluded that Mr. Montee started the fire.

[¶15] In one respect, however, Mr. Baldwin's conclusions differed from Detective Thomas's. He concluded that the "primary area of origin that is consistent with the damage and destruction done to this building is in the master bedroom closet on the west side of the building." With regard to the kitchen, Mr. Baldwin believed either that the fire started in the bedroom closet and was driven toward the kitchen, or that a second fire could have been set in the kitchen. Mr. Montee had told him that a bag of coal and bottles of propane fuel used for camping were in the kitchen. Mr. Baldwin said that such things are "usually not found in a kitchen together," and "together they form a pretty potent fuel package." He believed it possible that a fire started in the bedroom closet, moved toward the kitchen and "caught that fuel package" on fire. However, the information he had was not enough to say whether a second fire was set in the kitchen or the fire moved to the kitchen from the bedroom closet. "It could have happened either way."

[¶16] The attorney for the estate of Mr. Montee's mother confirmed that the homeowner's insurance policy on the Montee home had lapsed in December of 2010 for lack of payment. The attorney stressed the need for Mr. Montee to maintain insurance coverage in order to preserve the estate's property. An insurance agent confirmed that Mr. Montee had purchased a new homeowner's policy on January 28, 2011. When purchasing the new policy, Mr. Montee specifically asked the insurance agent if the policy covered fire. The agent told him it did. The manager of the insurance agency testified that Mr. Montee submitted a claim on the insurance on February 14, 2011, one day after the fire.

4

[¶17] The jury found Mr. Montee guilty of second degree arson. He was sentenced to a term of three to five years incarceration, which was suspended in lieu of three years of supervised probation. Mr. Montee challenges his conviction in this appeal.

## STANDARD OF REVIEW

[¶18] In reviewing the sufficiency of the evidence, we apply the following standard of review:

> [W]e examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial.

*Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738-39 (Wyo. 2012), quoting *Anderson v. State*, 2009 WY 119, ¶ 6, 216 P.3d 1143, 1145 (Wyo. 2009).

## DISCUSSION

[¶19] The crime of arson in the second degree is set forth in Wyo. Stat. Ann. § 6-3-102(a) (LexisNexis 2011): "A person is guilty of second-degree arson if he starts a fire or causes an explosion with intent to destroy or damage any property to cause collection of insurance for the loss." Applying this statute in Mr. Montee's trial, the district court instructed the jury that the elements of the crime were as follows:

1. On or about the 13th day of February, 2011
2. In Laramie County, Wyoming
3. The Defendant, **NICHOLAS M MONTEE**
4. Started a fire
5. With intent to destroy or damage any property to cause collection of insurance for the loss.

(Emphasis in original.) The district court duly instructed the jury that it should find the defendant guilty if "you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt," but that it should find the defendant not guilty if "on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt."

5

[¶20] Mr. Montee claims on appeal that the State did not provide sufficient evidence to support his conviction. He does not dispute the date or location of the fire, or that he may have started it. He claims, however, that the State provided only circumstantial evidence to establish intent, the fifth element of the crime of arson, and that such evidence was insufficient to prove beyond a reasonable doubt that he acted with intent to destroy or damage any property to cause collection of insurance for the loss.

[¶21] As an initial matter, we set aside Mr. Montee's protest that the State relied solely on circumstantial evidence to prove intent. As the district court instructed the jury in Mr. Montee's trial:

> There are two types of evidence from which you may find the truth as to the facts of a case – direct and circumstantial evidence. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness; circumstantial evidence is proof of a chain of facts and circumstances indicating whether the defendant is guilty or not guilty. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should weigh all the evidence in the case. After weighing all the evidence, if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty.

This jury instruction is consistent with a long line of decisions establishing that intent may be proven by circumstantial evidence alone. *E.g.*, *Browning v. State*, 2001 WY 93, ¶ 18, 32 P.3d 1061, 1068 (Wyo. 2001); *Wentworth v. State*, 975 P.2d 22, 26 (Wyo. 1999). We have observed that intent "is rarely capable of establishment by direct evidence," and that "circumstantial evidence . . . most often is the only manner of proof available." *Remmick v. State*, 2012 WY 57, ¶ 26, 275 P.3d 467, 472 (Wyo. 2012), quoting *Russell v. State*, 583 P.2d 690, 700 (Wyo. 1978). With specific regard to arson, we have observed that, "While all the evidence against the appellant is circumstantial this is not unusual because the very nature of the crime of arson ordinarily dictates that the evidence will be circumstantial." *Vialpando v. State*, 494 P.2d 939, 941 (Wyo. 1972). If the evidence was sufficient, the State could rely solely on circumstantial evidence to prove Mr. Montee's intent.

[¶22] Turning to Mr. Montee's claim that there was insufficient evidence to prove his intent, we believe the claim is readily disproved by the recitation of facts above. To recap, the State presented evidence of Mr. Montee's financial difficulties and his frustration with the condition of the house. Mr. Montee purchased insurance for the

home only sixteen days before the fire, and specifically asked the agent if the policy covered fire. He filed a claim for the insurance proceeds on the day after the fire. Detective Thomas and Mr. Baldwin both concluded that the fire was intentionally started by Mr. Montee, and explained the bases for that conclusion in detail. Moreover, Mr. Montee admitted during the interview that he turned on the stove and left the home, knowing the house would burn down. This evidence is sufficient to allow a jury to determine beyond a reasonable doubt that Mr. Montee started the fire with intent to destroy or damage the home to cause collection of insurance for the loss.

[¶23] For the sake of completeness, we note that Mr. Montee testified at trial that he did not start the fire intentionally. However, in analyzing a claim of sufficiency of the evidence, we consider only the evidence favorable to the State and the reasonable inferences that can be drawn from it. *Guerrero*, ¶ 14, 277 P.3d at 738-39. In addition, to the extent his trial testimony conflicted with the admissions made in the taped interview, it was the jury's prerogative to determine which evidence was more credible. As we said in a previous arson case, "Obviously there was a conflict in the evidence, but our rule is that the credibility of witnesses, the weight of the evidence, and conflicts in the evidence must be resolved by the finder of fact, the jury in this instance." *Aden v. State*, 717 P.2d 326, 328 (Wyo. 1986).

[¶24] At the heart of Mr. Montee's argument is an assertion that Detective Thomas's testimony conflicted with that of Mr. Baldwin. He characterizes that conflict in his brief:

> The prosecution's first expert witness stated firmly that the "primary point of origin of the fire was on the cooking surface of the island in the kitchen." The second expert stated, "The primary area of origin that is consistent with the damage and destruction done to this building is in the master bedroom closet on the west side of the building." It is clear that there is no consensus as to where the fire was started. There is therefore doubt as to where Mr. Montee was supposed to have started the fire.

(Internal citations omitted.)

[¶25] Further, Mr. Montee contends, both expert witnesses testified that they adhered to the NFPA921 Guide for Fire and Explosion Investigations. That source defines the term "probable" as "more likely true than not," and it defines the term "possible" as feasible but not probable. It explains that if two or more hypotheses are equally likely, then the level of certainty must be considered "possible." Detective Thomas concluded that the primary point of origin of the fire was the cooking surface of the kitchen island, with a possible secondary point of origin in the master bedroom closet. Mr. Baldwin testified that the primary place of origin was the master bedroom closet, and that the kitchen fire

7

was either the result of the primary fire or a possible second place of origin. Mr. Montee asserts that, because the experts presented two equally likely hypotheses about the origin of the fire, the two hypotheses can only be considered possible, not probable. "If the fire experts can only attribute a 'possible' likelihood as to where the fire started," he posits, the jury could not reasonably determine that "necessary fact to a greater degree, that of beyond a reasonable doubt."

[¶26] Mr. Montee's argument is unpersuasive. The origin of the fire is not a "necessary fact" because it is not one of the elements of the crime of second degree arson. In Mr. Montee's case, the State was required to prove that on or about the 13th day of February, 2011, in Laramie County, Wyoming, the Defendant, Mr. Montee, started a fire with intent to destroy or damage any property to cause collection of insurance for the loss. It was not required to prove where the fire started. After considering the evidence, the jury might have found that the fire started in the kitchen, in the bedroom closet, or in both places. *Aden*, 717 P.2d at 328 (The jury determines "the credibility of witnesses, the weight of the evidence, and conflicts in the evidence."). Wherever the fire originated, the evidence was sufficient for the jury to find that Mr. Montee started the fire with the requisite intent.

[¶27] Affirmed.