# IN THE SUPREME COURT, STATE OF WYOMING

# 2016 WY 48

APRIL TERM, A.D. 2016

May 11, 2016

LANCE DAVID BEAN,

Appellant
(Defendant),

v.

S-15-0177

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Albany County*
*The Honorable Jeffrey A. Donnell, Judge*

*Representing Appellant:*
Galen B. Woelk, Aron and Hennig, LLP, Laramie, Wyoming.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Joshua C. Eames, Assistant Attorney General. Argument by Mr. Eames.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   In 2011, Lance Bean was arrested for the 1972 rape and murder of Sharon Reher. He was charged with first-degree murder, rape, and attempted rape.  The jury acquitted him of the rape and murder charges, but convicted him of attempted rape.  The district court sentenced Mr. Bean to a suspended sentence of five to eight years in prison, and placed him on probation for five years.  Mr. Bean appeals, claiming that the district court abused its discretion when it failed to exclude touch DNA evidence, and that there was insufficient evidence to convict him of attempted rape.  We affirm.

*ISSUES*

[¶2]   We rephrase the issues as follows:

1.   Did the district court abuse its discretion when it denied Mr. Bean's motion to exclude results of touch DNA testing?

2.   Was there sufficient evidence to support Mr. Bean's conviction and the district court's denial of his motion for judgment of acquittal?

*FACTS*

***Ms. Reher's Party and Subsequent Events***

[¶3]   On Saturday, April 15, 1972, Sharon Reher hosted a party at her new apartment in Laramie, Wyoming.  At least sixteen people attended that party, approximately six females and ten males, including Mr. Bean.  During the party, several games were played, including a game referred to as the "blanket game," which involved draping a blanket over a person's head.  The person was then told to remove the article of clothing that he or she needed the least.  The point of the game was to get the person to remove the blanket.  Mr. Bean participated in the blanket game and, as a result, was present in Ms. Reher's bedroom at various times and had one of Ms. Reher's blankets or sheets draped over him during the course of the evening.

[¶4]   Around 2:00 a.m., some of the attendees of the party went home; others, including Kirby Ring, Steve Hamblin, Jay Schwartz, Jim Schwartz, Joe Schumacher, Mr. Bean, and Ms. Reher went to a bar in downtown Laramie.  One hour later, at approximately 3:00 a.m., Mr. Bean and Mr. Schumacher left the bar.

[¶5]   Around 4:30 a.m., Mr. Ring, the brother of Ms. Reher's boyfriend, drove her home from the bar.  Mr. Ring was the last person to see Ms. Reher alive.  Ms. Reher's brother, Ronald Reher, found her body in her apartment on Monday morning, April 17, 1972. After calling his parents and his work, Mr. Reher called the police.

1

*The Investigation*

[¶6]    When he arrived at the scene, Detective Vincent Valdez of the Laramie Police Department found Ms. Reher's body on the bed on top of the bed spread and other bedding.  Her pants had been pulled down over her hips, exposing her pubic area.  Her jacket, shirt, and bra had been pushed up, exposing her breasts, and a pair of torn pink panties was on the bed next to her left hip.  Ms. Reher's head and arms were dangling over the top part of the mattress, which had been separated from the wall and headboard.  There was a large wound on the right side of her neck and a pool of blood had accumulated on the floor beneath her head.  Some blood had been splattered on the heater and on the wall near the heater.  There was bruising over Ms. Reher's right eye, on the left side of her chin, and on the bridge of her nose.  In addition, there was an abrasion on her left knee, a bruise on her right knee, a bruise on her left wrist, and there were two cuts on her left hand.

[¶7]    Detective Valdez photographed the scene and he and Detective Gary Puls collected evidence.  Ms. Reher's body was then transported to the funeral home where an autopsy was performed.  The coroner estimated Ms. Reher's time of death to be between 5:00 a.m. and 6:00 a.m. on April 16, 1972.  The coroner also collected a sperm sample, estimating that Ms. Reher had engaged in intercourse one or two days prior.  He informed Detective Valdez that "as near as he could determine, [the sperm] were two to three days old, maybe longer, possibly five days old or longer."  The source of the sperm was never identified and the sample was not retained.

[¶8]    Detective Valdez conducted an investigation that included interviewing and collecting physical evidence from a number of suspects.[1]  Some physical evidence, including hair and pubic hair samples taken from Ms. Reher and the suspects, fingerprints found at the crime scene, the panties, and bedding, was sent to the FBI crime lab for testing.  (In 1972, DNA testing was not performed.)  Detective Valdez was unable to whittle his investigation to a single suspect.  As a result, the case was unsolved for almost forty years.  The case remained essentially untouched during that time, with the exception of evidence sent for testing in 2000 and again in 2005.

[¶9]    In 2011, Laramie Police Detective Joel Senior began working on the "cold case."  After his review of the evidence, Detective Senior selected areas of Ms. Reher's clothing and other items, including a portion of a fingernail that had been found in Ms. Reher's sink, to test for DNA.  He submitted those items to the Wyoming State Crime Laboratory.

---

[1] The suspects at the time were Joe Schumacher, Jay Schwartz, Jim Schwartz, Lance Bean, Kirby Ring, Steve Hamblin, Donal Rich, Donald Richardson, Mark Richards, and Sid Merritt.  Mark Richards had been arrested in connection with another sexual assault and, at the time, was considered a potential suspect.  Donald Richardson had come to the party at Ms. Reher's, but realized he was in the wrong place and left.  The remaining suspects either attended Ms. Reher's party or knew Ms. Reher.

Based largely on those test results, the State charged Lance Bean with three counts of first-degree murder: first-degree murder in perpetration of rape, and the alternative charges of murder in the first degree in perpetration of attempted rape, and murder in the first degree, purposely and with premeditated malice, all in violation of Wyo. Stat. § 6-54 (Michie 1957). Charges of rape and attempted rape, both in violation of Wyo. Stat. § 6-63 (Michie 1957, as amended and re-enacted by 1965 Wyo. Sess. Laws, ch. 89, § 1, and 1971 Wyo. Sess. Laws, ch. 70, § 1), were added in the State's Second Amended Felony Information, filed on November 21, 2014.

### *Motion in Limine*

[¶10]  Prior to the trial, Mr. Bean filed a motion in limine which sought to exclude DNA evidence at trial. After a hearing, the district court denied the motion, holding that the "results from the DNA tests do not suggest that the samples were so tainted as to make them unreliable and inadmissible." The court concluded that the jury "should be allowed to consider the evidence and determine the weight to afford[] to [it]." DNA evidence was admitted at trial and was a significant part of the State's case.

### *DNA Testing and Evidence at Trial*

[¶11]  Kathryn Normington from the Wyoming State Crime Laboratory testified that the lab performs two kinds of DNA testing: autosomal STR and Y-STR. The testing methodology is the same, regardless of whether the DNA tested is "touch DNA" or more traditional DNA from saliva, blood, or other bodily fluids. Autosomal testing examines the entire DNA profile, all of the DNA a person inherited from both his or her mother and father. Y-STR testing eliminates the female DNA and looks only to the Y-chromosome, which is inherited by males through their father. While Y-STR is not as unique as autosomal DNA (the same Y-chromosome passes from father to son and is identical within the paternal line), it is useful when looking for male and not female DNA profiles.

[¶12] Results from the testing can either result in the exclusion of an individual, a conclusion that the individual cannot be excluded, or no conclusion. Results exclude an individual when that person's DNA could not be consistent with or can be excluded from the unknown DNA being tested. When a person's DNA cannot be excluded, statistical analysis is performed to determine how rare or common that DNA profile is. The statistics will indicate the percentage of the population possessing the particular DNA profile and, therefore, the probability that the person whose DNA cannot be excluded was a contributor to the unknown DNA. When no conclusion is drawn, there is insufficient data to determine whether an individual's DNA is consistent or inconsistent with the unknown DNA being tested.

3

[¶13]  Ms. Normington testified that, with the exception of the fingernail and the cutouts from the bedspread and mattress pad, all of the items submitted for DNA testing contained what is referred to as "touch DNA."  In order to fully understand the DNA evidence presented and Mr. Bean's arguments concerning that evidence, it is important to understand what touch DNA is and some of the issues that arise when touch DNA is evaluated.  Touch DNA is

> the genetic information recovered from epithelial (skin) cells left behind when a person makes contact with an object. During the commission of a crime, an assailant can leave touch DNA samples behind . . . on a victim's clothing or other items implicated in the crime.  Touch DNA uses the same STR and PCR technology used to test more traditional sources of DNA--blood, semen, saliva, and other bodily fluids--to test recovered epithelial cells.  The difference between "traditional" DNA testing--the testing of bodily fluids--and touch DNA testing is that material from which the DNA is collected, not the method by which the DNA sample is analyzed.

Victoria Kawecki, Comment, *Can't Touch This? Making a Place for Touch DNA in Post-Conviction DNA Testing Statutes*, 62 Cath. U. L. Rev. 821, 828-29 (2013).  The amount of skin cells and corresponding DNA left on any particular object depends on a number of factors, including the rate at which an individual sheds skin cells (which can vary), the friction with which an item is touched, and even whether the person touching the item has dry or sweaty skin.

[¶14]  Touch DNA testing "is possible even if the sample contains only seven or eight cells from the outermost layer of [] skin."  Davis Phillips, *State v. Carver: A Cautionary Tale about the Use of Touch DNA as Inculpatory Evidence in North Carolina*, 49 Wake Forest L. Rev. 1545, 1558 (2014) (citation and internal quotation marks omitted).  Touch DNA is also subject to what is known as secondary transfer.  This refers to the "possibility that an individual or an object may serve as a conduit between a source and a final destination without any direct encounter."  David L. Faigman, et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony*, 4 Mod. Sci. Evidence § 30:13 (2015-2016 ed.).  "[I]f person A touches person B, and person B touches a pen, person A's DNA can be found on the pen." *State v. Carver*, 725 S.E.2d 902, 909 (N.C. Ct. App. 2012) (Hunter, J., dissenting), *aff'd*, 366 N.C. 372 (N.C. 2013).  The risk of secondary transfer, combined with the ability to detect even trace amounts of touch DNA, results in a greater likelihood of misleading or confusing results.  Phillips, 49 Wake Forest L. Rev. at 1559.

[¶15] With this background in mind, we turn to the DNA testing results in this case. Autosomal STR testing resulted in a patchwork of data. With the exception of the sperm found on the bedspread, all of the autosomal test results indicated mixtures of DNA from more than one contributor.

- The fingernail found in Ms. Reher's bathroom sink contained DNA from which both Ms. Reher and Mr. Bean could not be excluded.
- DNA from sperm found on the bedspread came from a single contributor and was consistent with Ronald Ring, Ms. Reher's boyfriend.
- DNA found on the mattress pad excluded Mr. Bean and all other suspects as contributors.
- DNA from swabs taken from the left side of the panties was consistent with Ms. Reher and another unknown person, who was never identified; it was inconclusive regarding Mr. Bean and a number of other suspects.
- DNA from swabs taken from the back of the panties was consistent with Ms. Reher and did not exclude another unknown individual; there was no conclusion regarding Mr. Bean, and all other suspects could be excluded.
- Swabs from the right side belt area of Ms. Reher's pants demonstrated DNA consistent with Ms. Reher, and there was a mixture from which Ms. Reher, Mr. Bean, and another unknown individual could not be excluded. All other suspects could be excluded.

[¶16] Y-STR testing indicated the following:

- DNA on the fingernail was consistent with or did not exclude Mr. Bean.
- Blood splatter on the heater near Ms. Reher's bed contained a mixture of DNA which revealed no conclusion with respect to Ronald Ring and Mark Richards, and excluded the remaining suspects, including Mr. Bean. (Because Y-STR only tests male DNA, it did not indicate whether the blood was Ms. Reher's.)
- The cutout from the bedspread revealed a single source of DNA that was consistent with Ronald Ring and no one else.
- DNA from the cutout from the mattress pad excluded all suspects.
- The profile obtained from the swabs on the left side of the panties indicated the presence of a mixture from which Mr. Bean and another unknown person could not be excluded as possible contributors. One distinct profile[2] from the side of the

_____

[2] The meaning of the term "one distinct profile" is not defined in the record. When asked about the meaning of that term, Ms. Normington testified:

> Going back to the bubble gum [an analogy used to explain DNA in a mixture], the gumballs, and we have the red and the green and you can see the mixture. If I have more red gumballs in there than I have green gumballs, you can actually tell there's [sic] more red gumballs in

5

panties was consistent with Mr. Bean, and no conclusions could be made regarding Donal Rich. The remaining suspects could be excluded.

- Swabs from the back of the panties demonstrated the presence of a mixture of DNA from which Mr. Bean and Steve Hamblin could not be excluded as possible contributors. Additionally, one distinct profile was consistent with Mr. Bean, and Steve Hamblin could not be excluded as a contributor.

- Swabs from the right side of the panties demonstrated the presence of a mixture of DNA from which Mr. Bean and another unknown individual could not be excluded as possible contributors. One distinct profile was consistent with Mr. Bean, and no conclusions could be made regarding Jay Schwartz, Neil Scratch, Steve Hamblin, James Schwartz, or Ronald Reher. The remaining suspects could be excluded.

- Analysis of swabs from the left belt area of the pants showed a mixture of DNA. No conclusion could be made regarding Mr. Bean, Ronald Ring, or Donal Rich. The remaining suspects could be excluded.

- Swabs taken from the left sleeve/wrist of Ms. Reher's jacket demonstrated the presence of a mixture, with no conclusion as to Neil Scratch, Mr. Bean, Steve Hamblin, Ronald Ring, Mark Richards, Donald Richardson, or Donal Rich. The remaining suspects could be excluded.

- Y-STR tests of DNA from swabs taken from the lower front of Ms. Reher's t-shirt resulted in no conclusions with respect to Mr. Bean, Mark Richards, Donald Richardson, or Donal Rich. The remaining suspects could be excluded as contributors.

- The DNA profile from swabs taken from the lower front surface of Ms. Reher's bra was a mixture from which Mr. Bean and an additional individual could not be excluded, and one distinct profile was found to be consistent with Mr. Bean. No conclusions could be made with respect to Joseph Schumacher, Ronald Reher, Ronald Ring, or Mark Richards. The remaining suspects could be excluded.

---

there. And that would be what is called a major contributor or they contributed the major amount of DNA in that sample.

It is denoted in our report when it's a major contributor or a more of those red gumballs as a distinct profile.

Thus, it appears from Ms. Normington's testimony, that when "one distinct profile" is found, it means that there were more of that DNA than other DNA in a mixture. Scientific literature indicates that a "profile" or a "full profile" is an evaluation of DNA STR in 13 specific locations; and a "partial profile" is one that does not yield identifiable results in all 13 locations. *See* Scientific Testimony An Online Journal, *DNA Testing: An Introduction for Non-Scientists An Illustrated Explanation*, available at http*://www.scientific.org/tutorials/articles/riley/riley.html* (last visited May 9, 2016); Crime Scene Investigator Network, *A Simplified Guide to DNA Evidence*, available at *http://www.crime-scene-investigator.net/SimplifiedGuideDNA.pdf* (last visited May 9, 2016).

6

- Finally, swabs taken from the cuff of Ms. Reher's pant legs indicated the presence of a mixture of DNA from which no conclusion could be drawn regarding Mr. Bean, Steve Hamblin, or Donal Rich. The remaining suspects could be excluded as contributors.

[¶17] Ms. Normington testified that the statistics regarding the probability that there will be a match of the Y-STR DNA on the tested items were as follows:

- Left side of panties: Y-STR DNA halotype found on the item that was consistent with Mr. Bean's DNA occurs in 1 out of every 71 individuals.
- Back of panties: Y-STR DNA halotype found on the item that was consistent with Mr. Bean's DNA occurs in 1 out of every 450 individuals.
- Right side of panties: Y-STR DNA halotype found on the item that was consistent with Mr. Bean's DNA occurs in 1 out of every 314 individuals.
- Lower front surface of bra: Y-STR DNA halotype found on the item that was consistent with Mr. Bean's DNA occurs in 1 out of every 2632 individuals.
- Right side belt area of pants: Y-STR DNA halotype found on the item that was consistent with Mr. Bean's DNA occurs in 1 out of every 781 individuals.
- Fingernail: Y-STR DNA halotype found on the item that was consistent with Mr. Bean's DNA occurs in 1 out of every 5556 individuals.

[¶18] This patchwork of evidence, when stripped to its core with respect to Mr. Bean, indicates that DNA consistent with Mr. Bean's DNA was found on Ms. Reher's bra, her underwear, the waist of her pants, and on the fingernail that was located in her bathroom sink. Other evidence presented by the State includes a 1972 interview in which Mr. Bean explained that after leaving the bar, he took Joe Schumacher home and then, instead of heading home, he went to his work, which was in the opposite direction. There, he called his mother, vomited, and then proceeded home. The State also presented a 2011 interview of Mr. Bean where he repeatedly denied having committed the crime but said, "If I was there, then I don't remember what happened[,]" and "If I did it, I don't remember."

[¶19] At the close of the State's evidence, Mr. Bean moved for a Rule 29 judgment of acquittal. The district court denied that motion. Following the denial, Mr. Bean did not present any evidence and the case proceeded to the jury. The jury found Mr. Bean guilty of attempted rape, but acquitted him of the murder and rape charges. Mr. Bean then renewed his motion for judgment of acquittal. Again, the district court denied that motion. Mr. Bean was sentenced on May 26, 2015, and timely appealed.

[¶20] Additional facts will be discussed as they are relevant in the discussion portion of this opinion.

7

**I.**  ***Did the district court abuse its discretion when it denied Mr. Bean's motion to exclude results of touch DNA testing?***

[¶21] Mr. Bean argues that the district court abused its discretion when it denied his motion in limine, which sought to exclude DNA test results because that evidence was inherently unreliable. He contends that the evidence was likely contaminated and that the investigators failed to follow current DNA collection and storage protocols, which did not exist in 1972.

**A. Standard of Review**

[¶22] Generally, expert testimony is admissible if it meets the requirements of W.R.E. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[¶23] In *Bunting v. Jamieson*, 984 P.2d 467 (Wyo. 1999), we expressly adopted the analysis of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995), to aid Wyoming courts in determining whether to admit or exclude expert testimony. We adopted *Daubert's* two-part test: first, the trial court is to determine whether the methodology or technique used by the expert is reliable, and second, the trial court must determine whether the proposed testimony "fits" the particular case. *Bunting*, 984 P.2d at 471. We explained that the primary goal of *Daubert's* gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Bunting*, 984 P.2d at 471 (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999)).

[¶24] Here, however, the parties stipulated that a *Bunting/Daubert* hearing was not necessary. They agreed that "DNA analysis, including the YSTAR method, is accepted science, which produces reliable results, assuming reliable data is used in the testing process." They stipulated that the "DNA evidence is a good 'fit' for this case." Instead of challenging the admissibility of DNA testing in general, Mr. Bean's motion in limine contested the "admissibility of the DNA evidence *in this particular case* due to the high

potential of contamination or cross-contamination rendering the results of otherwise reliable DNA testing unreliable." (Emphasis in original.) As a result, the district court properly did not conduct a *Bunting/Daubert* analysis and instead looked to the question of whether the DNA evidence in this case was relevant under W.R.E. 402 and whether it should be excluded under W.R.E. 403. *See Easum v. Miller*, 2004 WY 73, ¶ 21, 92 P.3d 794, 800 (Wyo. 2004); *People v. Wesley*, 633 N.E.2d 451, 457-58 (N.Y. 1994) (once the general reliability of scientific evidence is established, the focus shifts to the admissibility of the evidence sought to be introduced, and issues concerning the "specific reliability of the procedures followed to generate the evidence" may be raised).

[¶25] We review a district court's decision to admit or reject expert testimony for an abuse of discretion. *Easum*, 2004 WY 73, ¶ 21, 92 P.3d at 800. "A decision to admit or reject expert testimony rests solely within the discretion of the district court and is not disturbed on appeal absent a clear showing of an abuse of discretion." *Cooper v. State*, 2008 WY 5, ¶ 9, 174 P.3d 726, 728 (Wyo. 2008) (citation omitted).

[¶26] Rule 402 of the Wyoming Rules of Evidence requires evidence to be relevant before it is admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." W.R.E. 403. Thus, even after a conclusion that DNA testing is scientifically valid and reliable, DNA evidence may be challenged as irrelevant or unfairly prejudicial.

> The admissibility of [DNA] evidence remains subject to attack. Issues pertaining to *relevancy or prejudice* may be raised. For example, expert testimony may be presented to impeach the particular procedures used in a specific test or the reliability of the results obtained. In addition, traditional challenges to the admissibility of evidence such as the contamination of the sample or chain of custody questions may be presented. These issues relate to the weight of the evidence. The evidence may be found to be so tainted that it is totally unreliable and, therefore, must be excluded.

*State v. Futrell*, 436 S.E.2d 884, 889 (N.C. Ct. App. 1993) (citations omitted).

> Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This Court will generally accede

9

to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.

*Lawrence v. State*, 2015 WY 97, ¶ 10, 354 P.3d 77, 80 (Wyo. 2015) (quoting *Brock v. State*, 2012 WY 13, ¶ 23, 272 P.3d 933, 939-40 (Wyo. 2012)); *see also Reichert v. Phipps*, 2004 WY 7, ¶ 5, 84 P.3d 353, 355-56 (Wyo. 2004) (we review district court rulings on the admissibility of evidence for abuse of discretion). We therefore consider whether the district court's determination that the DNA evidence was relevant and admissible was reasonable or whether it exceeded the bounds of reason under the circumstances.

## B. Analysis

[¶27] Mr. Bean argues that the evidence collection methods used by the Laramie police officers on scene increased the likelihood of evidence contamination and did not comply with established DNA collection protocols. As a result, he argues, the DNA evidence was inherently unreliable and should have been excluded by the district court. The district court focused on the collection and storage methods undertaken by the Laramie Police Department in 1972 and explained that "issues of contamination or improper collection and storage methods generally go to the weight, not the admissibility of DNA evidence" unless the evidence is so tainted that the DNA test is unreliable. The district court concluded that "the actual collection and storage of this 1972 evidence was not so faulty as to negate its consideration by a jury" and held that the jury "should be allowed to consider the evidence and determine the weight to afford[] to [it]." Although the process used leaves room for the possibility that contamination or secondary transfer could have occurred, the testimony concerning collection of the items ultimately tested for DNA revealed that in 1972 the Laramie police officers employed state-of-the-art methods for evidence collection and analysis at the time, including taking precautions to avoid transferring trace evidence such as blood, hair, and fingerprints, and carefully documenting and packaging each item as it was collected.

[¶28] Evidence at the hearing on Mr. Bean's motion in limine revealed the following: After documenting the scene on camera, Detectives Valdez and Puls proceeded to collect evidence. As Detective Valdez collected each piece of evidence, Detective Puls recorded the time and a description of what had been collected. They had an evidence collection kit that contained envelopes, paper sacks, plastic bags, and scissors with a clamp on the end for picking things up. That kit did not contain gloves and they did not wear gloves. Detective Valdez explained that he used paper folds, a folded piece of notebook paper used like tweezers, to pick items up so he would not transfer his fingerprints or anything with his own blood type. He testified that he did not recall whether he used a different

10

piece of paper to collect each piece of evidence.[3]  Each item was placed in a paper bag or other container from the collection kit.

[¶29]  After Detective Valdez finished collecting the evidence at Ms. Reher's apartment, the coroner and Detectives Valdez, Puls, and James removed Ms. Reher's body from her bed and placed it in a body bag.  In doing so, they touched her jacket, pants, t-shirt, and bra.  Once they were at the funeral home, the coroner removed Ms. Reher's clothing in the following order: socks, pants, jacket, t-shirt, bra.  He placed them in separate paper sacks held by Detective Valdez.  The coroner was wearing gloves at the time, but did not change his gloves between items of clothing.

[¶30]  The evidence was then brought back to Detective Valdez's office.  Each wet item was taken from its paper sack and placed onto butcher paper spread out on the table so that it could dry.  Each piece of evidence was then placed in a separate plastic evidence bag, sent to the FBI for analysis, and ultimately returned to Laramie.  Detective Valdez could not recall how long it took the FBI to return the evidence to the Laramie Police Department.  Ms. Normington of the Wyoming Crime Laboratory testified that she had no way of knowing whether any piece of evidence that she tested had previously been contaminated or how any particular DNA became deposited on an item.

[¶31] Mr. Bean urges us to conclude that these facts concerning the collection and potential contamination of the touch DNA required the exclusion of that evidence.  "[I]t is the distinctive province of the court to determine the competency and admissibility of evidence."  40A Am. Jur. 2d *Homicide* § 478 (updated 2016).  However, "the weight to be attached to specific parts of the evidence introduced, as well as the credence to be given to the testimony of the witnesses, is wholly within the province of the jury."  *Id*.; *see also Wise v. Ludlow*, 2015 WY 43, ¶ 53, 346 P.3d 1, 14 (Wyo. 2015) ("An expert's conclusions may be wrong, but if his methodology is reliable, the accuracy of his conclusions presents a jury question that must be presented at trial." (internal quotation marks and citation omitted)); *Snow v. State*, 2009 WY 117, ¶ 31, 216 P.3d 505, 515 (Wyo. 2009) (emphasizing the importance of the jury as fact-finder, especially in criminal cases).  Recognizing the separate roles of the court and the jury, we have held that "concern about specific procedures goes to the reliability of the evidence and the weight given by the jury."  *Springfield v. State*, 860 P.2d 435, 444 (Wyo. 1993).

> The district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue would go more to the weight than to the admissibility of the evidence.  Rarely should such a factual determination be

---

[3] At trial, Detective Valdez testified that he did not believe he would have changed the paper fold between items as he collected each piece of evidence.

11

> excluded from jury consideration. With adequate cautionary instructions from the trial judge, vigorous cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable.

*Id.* (quoting *United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir. 1992)) (upholding admission of DNA results over defendant's claims of error in that profiling procedure was not examined and test results lacked a proper foundation). Cases cited by both Mr. Bean and the State align with the notion expressed in *Springfield* that issues of contamination or improper storage of evidence generally go to the weight and not the admissibility of that evidence. *See State v. Connell*, No. 98,870, 2012 WL 222926, *9 (Kan. Ct. App. January 20, 2012) ("[T]raditional challenges to the admissibility of evidence such as the contamination of the sample or chain of custody . . . relate to the weight of the evidence."); *United States v. Lowe*, 954 F.Supp. 401, 420 (D. Mass. 1996) ("The potential for and significance of contamination . . . impact the weight of the evidence rather than its admissibility."); *State v. Ford*, 392 S.E.2d 781, 784 (S.C. 1990) (problems with contamination or chain of custody for DNA evidence go to the weight of the evidence); *see also Charley v. Estes*, No. 4:12-CV-1069-VEH-JEO, 2015 WL 2354258, at *18 (N.D. Ala. May 14, 2015) (potential for contamination of forensic evidence generally goes to its weight, not admissibility).

[¶32] In general,

> concerns about contamination and degradation of forensic samples are not unique to DNA samples. Those concerns may arise with respect to any forensic evidence. The potential for contamination may present an open field for cross-examination or may be addressed through testimony of defense experts at trial, as is true of other forensic evidence.

*State v. Cunningham*, 105 P.3d 929, 932 (Or. Ct. App. 2005) (quoting *State v. Lyons*, 924 P.2d 802, 813 (Or. 1996)). There may, however, be instances when forensic evidence, including DNA evidence, is so unreliable that it should be excluded. *Connell*, 2012 WL 222926, at *9 (stating "[t]he evidence may be found so tainted that it is totally unreliable and, therefore, must be excluded[,]" but despite discrepancy in dates of obtaining DNA swab sample, it would have been admitted at trial); *Armstead v. State*, 673 A.2d 221, 233 (Md. Ct. App. 1996) (holding that "the trial judge retains the discretion to exclude DNA evidence if errors in the laboratory procedures render it so unreliable that it would not be helpful to the trier of fact[,]" but that trial court did not abuse its discretion by admitting that evidence); *State v. Hill*, 895 P.2d 1238, 1244-47 (Kan. 1995) (stating that "[DNA] test results may be inadmissible on grounds of relevancy or prejudice as well as under traditional challenges to admissibility of evidence such as contamination of the sample or

chain of custody questions[,]" but holding that small sample size and potential for contamination went to weight of the evidence, not admissibility); *Ford*, 392 S.E.2d at 784 (when taint makes test results unreliable, DNA evidence may be excluded, but because the defendant failed to challenge the evidence at trial, DNA test results were properly admitted). In *Springfield*, we held that "if the procedures produce an unreliable result, then the court may exclude the evidence entirely." 860 P.2d at 443. We agree that, in some cases, "the probability of transfer may serve as the basis for a motion to exclude evidence in a situation where transfer is so likely that invoking DNA findings may risk unduly prejudicing the jury." Faigman, *supra*, 4 Mod. Sci. Evidence § 30:13. This, however, is not such a case. Cases where courts have found that DNA evidence was so unreliable as to be inadmissible are rare. After a thorough search, we have located very few, none of which are on point. *See, e.g., People v. Castro*, 545 N.Y.S.2d 985, 999 (N.Y. Sup. Ct., Bronx County 1989) (holding that because the evidence revealed that the testing laboratory failed to comply with established testing procedures, the results were inherently unreliable and were inadmissible as a matter of law).

[¶33] The overwhelming majority of courts have admitted DNA evidence, allowing questions concerning contamination and chain of custody to be explored through cross-examination and the defendants' presentation of their own expert testimony. *See, e.g., People v. Ortiz*, 914 N.Y.S.2d 281, 282 (N.Y. App. Div.2d Dep't 2011); *Cunningham*, 105 P.3d at 932 (question of contamination of hair shaft with DNA that was the same type as the defendant's and 10% of the population was an issue that could be developed for the jury); *State v. Wommack*, 770 So.2d 365, 372 (La. Ct. App. 3 Cir. 2000) (possible contamination where clothing was bagged together and lack of accreditation of FBI lab at the time of testing was properly before the jury); *State v. Moore*, 885 P.2d 457, 470, 474 (Mont. 1994) (defendant's objections regarding laboratory's analysis, procedure, and potential contamination went to the weight given to the evidence by the jury, and were not questions of admissibility), *abrogated on other grounds by State v. Gollehon*, 906 P.2d 697 (Mont. 1995); *State v. Bruno*, 424 S.E.2d 440, 445 (N.C. Ct. App. 1993) (conflict in DNA test results performed by two different experts did not render evidence so unreliable as to be excluded, rather it was an issue properly left to the jury); *State v. Anderson*, 881 P.2d 29, 48 (N.M. 1994) ("Any controversy over the results of the testing and the statistical calculations goes to the weight of the evidence and is properly left to the trier of fact.").

[¶34] In *State v. Ramsey*, 550 S.E.2d 294 (S.C. 2001), DNA evidence tied the defendant to the scene of a murder when blood found on a sweater at the crime scene and blood on the defendant's boot did not exclude the victim's DNA profile. *Id.* at 298. The defendant argued that this DNA evidence should have been excluded because the police had committed what he referred to as "classic violations of evidence preservation." *Id.* Pieces of evidence had been taken from the crime scene to other locations where they were subject to contamination: blood evidence had been taken from the scene of the murder to a bar frequented by the defendant and then to the defendant's home; the

sweater found at the murder scene was transported to the bar where investigators removed hairs from the sweater; and bloody footprint casts were taken from the murder scene to the defendant's home where they were washed. *Id*. According to one expert, blood that had been on the footprint casts may have splashed onto the defendant's boot during that time, rendering evidence of blood found on the boot unreliable. *Id*. The South Carolina Supreme Court held:

> We find the DNA evidence in this case is not so tainted that it is totally unreliable. Two conflicting theories were offered at trial as to how the evidence was collected and its potential for contamination. [The defendant] maintains the blood on the boot could be contaminated, while the police officers testified they were careful and complied with procedures. We find these issues relate to the weight of the evidence.

*Id*. at 298.

[¶35] In *Williams v. State*, 2002 WY 184, ¶ 7, 60 P.3d 151, 154-55 (Wyo. 2002), the defendant challenged the admission of testimony of a handwriting expert. After concluding that the trial court's admission of that testimony was proper under *Daubert* and *Bunting*, we recognized that the defendant had "the opportunity to cross-examine this expert to adequately test his expressed opinions and point out to the jury those reasons she believed that the testimony was not credible and should not have been relied upon by the jury." *Id*. at ¶ 20, 60 P.3d at 159. We went on to note that "*Daubert* recognized '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. (citations omitted).

[¶36] In *People v. Ortiz*, a child who was allegedly sexually assaulted deposited her underpants in a clothes hamper which also contained clothes worn by non-suspect family members. 914 N.Y.S.2d at 282. Twenty days after the underpants were deposited in the hamper, the victim removed the underpants from the clothes hamper and gave them to the police. *Id*. DNA tests revealed the presence of male DNA consistent with the defendant and the presence of a second male's DNA that was consistent with the victim's father, which could have come from contact with the victim's father's clothing that had been mixed with the victim's clothing in the hamper. *Id*. The defendant challenged the admission of the DNA evidence, claiming that there was not a valid chain of custody and that it had been contaminated. The Court held the admission of the underpants was proper:

> The testimony at trial gave reasonable assurances that the underpants admitted into evidence were the same underpants the complainant had worn at the time of the incident and were

substantially unchanged. Moreover, once the People properly authenticated the underpants, any evidence that the *DNA* on the underpants could have been contaminated goes to the weight of the evidence, not to the admissibility of the evidence (*see People v. Klinger*, 185 Misc.2d 574, 586, 713 N.Y.S.2d 823[, 831 (N.Y. County Ct. 2000)]; *see also People v. KO*, 304 A.D.2d 451, 452, 757 N.Y.S.2d 561[,562 (N.Y. App. Div. 1st Dep't 2003)], *remanded on other grounds* 542 U.S. 901, 124 S.Ct 2839, 159 L.Ed.2d 265)).

*Id.* (some citations omitted).

[¶37] Likewise, in *People v. Van Zant*, No. 5-11-0034, 2012 WL 7069973 at *9 (Ill. App. Ct. March 21, 2012), the defendant challenged the trial court's denial of his motion in limine seeking to exclude DNA evidence found on a firearm because a sufficient sample was not available to test all the markers for the Y-STR DNA due to degradation to the sample caused by either the environment or age. He also contended that the DNA evidence was unreliable because it only indicated that he could not be excluded as having handled the weapon, and also indicated that approximately 1 in 100 African-American males, 1 in 33 white males, and 1 in 100 Hispanic males could also not be excluded from the mixture found on the weapon. *Id.*

[¶38] The appellate court held:

[Q]uestions concerning the reliability of statistical probabilities developed from DNA-evidence testing go toward the weight given to the evidence rather than its admissibility as evidence. *People v. Redman*, 135 Ill. App. 3d 534, 540 (1985); *People v. Liscomb*, 215 Ill. App. 3d 413, 436[, 574 N.E.2d 1345, 1359] (1991). Further, in *People v. Hickey*, 178 Ill.2d 256, 279 (1997), the supreme court concluded that issues concerning the caliber of work of DNA testing, including laboratory protocol and the manner in which it was followed, quality control and quality assurance measures employed, and the possible contamination or degradation of DNA samples, are issues going toward the weight of the evidence rather than admissibility.

*Id.*, 2012 WL 7069973 at *8.

[¶39] In this case, it is true that DNA analysis and protocols for DNA evidence collection did not exist in 1972 when the evidence was collected. However, the fact that evidence would now be collected in a different manner than it was in 1972 does not alone

render the 1972 evidence so unreliable as to warrant exclusion. In 1972, the purpose of state-of-the-art methods of evidence collection was to maintain its integrity for the examination of blood, semen, fingerprints, hairs, fibers, and soils. Detective Senior testified that concerns about the collection and contamination of trace evidence in 1972 are the same concerns about the collection and contamination of DNA evidence in 2015. He also testified that trace evidence is collected in "about the same manner today as it was back in 1972." Evidence collection kits have not changed much over the years; the items available for collection and storage of evidence have not changed much; and the methods used for packaging evidence are similar.

[¶40] At the motion in limine hearing, Mr. Bean explored the issues of the integrity of the DNA evidence. His counsel examined the State's witnesses regarding potential touch DNA contamination, secondary transfer of touch DNA, the Laramie Police Department's evidence collection and storage methods, and the Wyoming State Crime Laboratory's procedures and statistical analysis methods. He highlighted the officers' failure to change paper folds between items of evidence as they collected evidence at the scene and the coroner's failure to change gloves between items of clothing as he removed them from Ms. Reher's body, both of which could lead to the possibility of secondary transfer during collection. He also highlighted the fact that it is unknown how the evidence was handled by the FBI. These facts certainly introduced the possibility of contamination of the evidence. However, Mr. Bean did not put on testimony of an expert of his own to establish how any particular piece of evidence was rendered unreliable. Without more than speculation that contamination could have occurred, we cannot conclude that the district court abused its discretion in determining that the issue of contamination was one that the jury could weigh in its fact-finding role. As one court explained:

> Absent evidence of tampering, allegations or questions regarding the care and custody of a piece of evidence go to the weight to be given that evidence, not its admissibility. Here, the only evidence appellant put forth regarding contamination of the evidence is the fact that it was stored by the old HPD [Houston Police Department] crime lab. Although appellant offered evidence challenging the reliability of the old HPD crime lab as a whole, he offered no evidence that the particular evidence at issue in the instant case had been tampered with or contaminated. In response to appellant's claims, the State introduced testimony to support the reliability of the evidence at issue.

*Cruz-Garcia v. State*, No. AP-77,025, 2015 WL 6528727, at *13 (Tex. Crim. App. Oct. 28, 2015).

16

[¶41] The district court did not abuse its discretion when it concluded that the touch DNA evidence was not so unreliable that it ought to be excluded from the jury's consideration.

## II. Was there sufficient evidence to support Mr. Bean's conviction and the district court's denial of his motion for judgment of acquittal?

[¶42] We next address Mr. Bean's arguments that there was insufficient evidence to support his conviction of attempted rape and that the district court accordingly erred in denying his motions for judgment of acquittal.

### A. Standard of Review

[¶43] We review the denial of a motion for judgment of acquittal using the following standard:

> Our responsibility in considering the propriety of a ruling on a motion for judgment of acquittal is the same as that of the trial court. *Cloman v. State*, Wyo., 574 P.2d 410 (1978). The question raised is the sufficiency of the evidence to sustain the charge, which is a matter to be determined within the sound discretion of the trial court. *Chavez v. State*, Wyo., 601 P.2d 166 (1979); *Montez v. State*, Wyo., 527 P.2d 1330 (1974). In making that determination the district court must assume the truth of the evidence of the State and give to the State the benefit of all legitimate inferences to be drawn from that evidence. If a prima facie case is demonstrated when the evidence is so examined, the motion for judgment of acquittal properly is denied. *Russell v. State*, Wyo., 583 P.2d 690 (1978). It is proper to grant a motion for judgment of acquittal only if there is no substantial evidence to sustain the material allegations relating to the offense that is charged. *Heberling v. State*, Wyo., 507 P.2d 1 (1973), *cert. denied* 414 U.S. 1022, 94 S.Ct. 444, 38 L.Ed.2d 313 (1973); *Fresquez v. State*, Wyo., 492 P.2d 197 (1971). Such a result is indicated if the evidence requires the jury to speculate or conjecture as to the defendant's guilt or if a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime when the evidence is viewed in the light most favorable to the State. *Chavez v. State*, *supra*; *Russell v. State*, *supra*.

*Taylor v. State*, 2011 WY 18, ¶ 10, 246 P.3d 596, 598-99 (Wyo. 2011) (quoting *Martinez v. State*, 2009 WY 6, ¶ 11, 199 P.3d 526, 530 (Wyo. 2009)). This standard applies whether the supporting evidence is direct or circumstantial. *Bruce v. State*, 2015 WY 46, ¶¶ 51-52, 346 P.3d 909, 925-26 (Wyo. 2015).

[¶44] We review a claim of insufficiency of the evidence in the following manner:

> We examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial.
>
> *Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738-39 (Wyo. 2012) (quoting *Anderson v. State*, 2009 WY 119, ¶ 6, 216 P.3d 1143, 1145 (Wyo. 2009)).
>
> The State's evidence must be accepted as true, and it must be given all favorable inferences flowing from it.

*Andersen v. State*, 2014 WY 88, ¶¶ 23-24, 330 P.3d 256, 263 (Wyo. 2014); *see also Toth v. State*, 2015 WY 86A, ¶ 15, 353 P.3d 696, 702 (Wyo. 2015).

> [A]fter drawing into the open only the evidence adverse to the defendant, we examine whether that evidence permits the jury's inference that the defendant violated the elements of the statute as charged. Our focus is singular and only examines the **reasonableness of the inference** from premises admittedly adverse to the defendant.

*Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 967 (Wyo. 2015) (emphasis in original) (citations omitted).

[¶45] We do not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder." *Hill v. State*, 2016 WY 27, ¶ 13, --- P.3d ---, --- (Wyo. 2016) (citing *Levengood v. State*, 2014 WY 138, ¶ 12, 336 P.3d 1201, 1203 (Wyo. 2014)). "We will not reweigh the evidence nor will we re-examine the credibility of the

witnesses." *Hill*, 2016 WY 27, ¶ 12, ---, P.3d at --- (citation omitted). We review the sufficiency of the evidence "from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Oldman*, 2015 WY 121, ¶ 5, 359 P.3d at 966.

[¶46] Mr. Bean argues that "if the evidence is as consistent with innocence as with guilt, it is insufficient to sustain a conviction, since in such case there cannot be a moral certainty of guilt and the rule of reasonable doubt has not been met." *State v. Osmus*, 73 Wyo. 183, 276 P.2d 469, 481 (Wyo. 1954). He relies upon *Osmus* and other cases decided long before the sufficiency of the evidence standard of review was first articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), and applied by this Court in *Shafsky v. State*, 526 P.2d 60, 61 (Wyo. 1974). As the Colorado Supreme Court has explained, "the old rule requiring the prosecution 'to exclude every reasonable hypotheses other than that of guilt' was confusing and outmoded." *Clark v. People*, 232 P.3d 1287, 1292 (Colo. 2010).

## B. Analysis

[¶47] At first blush, there appears to be a logical inconsistency in the verdict because the jury convicted Mr. Bean of attempted rape, but not rape or murder. But the jury found that the State did not prove beyond a reasonable doubt that Mr. Bean murdered or raped Ms. Reher, and the only question before us is whether the evidence could reasonably support a jury's conclusion that the State proved Mr. Bean attempted to rape Ms. Reher beyond a reasonable doubt.

[¶48] In 1972, the crime of attempted rape required proof of the following: (1) assault or assault and battery; (2) upon any female; (3) with the intent to commit rape. Wyo. Stat. § 6-64.[4] Attempted rape is a specific intent crime, which means that the State bears the

---

[4] Attempted rape was defined as:

> Whoever perpetrates an assault or assault and battery upon any female with intent to commit the crime of rape, shall, upon conviction, be imprisoned in the penitentiary not less than one year nor more than fifty years.

Wyo. Stat. § 6-64 (Michie 1957). Rape was defined as:

> (A) Whoever unlawfully has carnal knowledge of a woman or female child forcibly and against her will is guilty of first-degree rape, and shall be imprisoned in the penitentiary for any term not less than one (1) year, or during life.

1965 Wyo. Sess. Laws, ch. 89, § 1(A).

19

burden of proving the defendant intended to commit rape. *Sanchez v. State*, 567 P.2d 270, 275 (Wyo. 1977); *Rhodes v. State*, 462 P.2d 722, 728 (Wyo. 1969).

[¶49] The State's evidence consisted of the DNA evidence, excerpts from 1972 and 2011 interviews conducted by the Laramie Police Department with Mr. Bean, and details of the crime scene at Ms. Reher's apartment. DNA consistent with Mr. Bean's DNA was found on Ms. Reher's bra, her underwear, the waist of her pants, and on the fingernail that was located in her bathroom sink. Detective Valdez testified that they processed the bedroom first and then moved to the kitchen area of the apartment. Further, Detective Valdez testified that the first items of evidence that he collected were hair specimens and the panties lying next to Ms. Reher's body, which would mean they were less likely to have been contaminated during collection.

[¶50] During his 1972 interview, Mr. Bean recounted what Detective Valdez considered to be a "strange" sequence of events. Mr. Bean explained that after leaving the bar, he took Joe Schumacher home and then, instead of heading home, he went to his work, which was in the opposite direction. There, he called his mother, vomited, and then proceeded home. And, in 2011, when he was interviewed a second time, Mr. Bean made the following statements:

- Bean: "If I was there, then I don't remember what happened."
- Bean: You'd have to remember something like that. Laramie Police Detective: I agree with you.
- Bean: If I was there I don't . . . I don't think I was, but I can't say for 100% because I don't know.
- Bean: "I don't remember. If I did it, I don't remember."

There was also evidence of a struggle on Ms. Reher's bed and on Ms. Reher's body. Finally, Ms. Reher's clothes were left to reveal her breasts and pubic area, and there was sperm detected in a vaginal swab taken from Ms. Reher. Mr. Bean contends that this evidence was insufficient to establish the elements of his identity, an intent to rape Ms. Reher, or her fear of imminent peril.[5] We address each element below.

A.     Identity

[¶51] Mr. Bean posits that DNA evidence is insufficient to prove a perpetrator's identity when his presence at a crime scene can be innocently explained. He argues that the presence of DNA consistent with his on Ms. Reher's bra, underwear, and pants could be the result of his attendance at her party, his presence in her bedroom during the party, and

---

[5] This element comes from Jury Instruction No. 12, paragraph 6, which set forth the requirements for proof of attempted rape and included "a fear of imminent peril in Sharon Reher that she would be raped" as an element that had to be established by the State.

his participation in the "blanket game." Therefore, he claims, the evidence is insufficient to prove his identity as the attempted rapist.

[¶52] We recognize that DNA evidence serves a different purpose in cases where a defendant claims he was never at the crime scene, than in cases where a defendant has an innocent explanation for his presence at the scene of the crime. DNA evidence can be relevant to establish the identity of the perpetrator in either circumstance. However, when a defendant's presence can be innocently explained, to be relevant to establish guilt, the DNA evidence must be found in a place or manner inconsistent with innocent contact.

[¶53] In *Cotton v. State*, 144 So.3d 137, 140 (Miss. 2014), *reh'g denied* (Aug. 21, 2014), the defendant challenged the sufficiency of DNA evidence to support his conviction of murder. The only evidence connecting Cotton to the victim was the DNA under her fingernail. DNA testing revealed that scrapings taken from under the victim's fingernails contained a mixture of at least two individuals, one of whom was male and had a profile consistent with Cotton's. *Id*. at 139. Cotton argued that the victim could have come in contact with his DNA when she waited on him at a restaurant where she worked. *Id*. at 141. The Mississippi Supreme Court held:

> While no Mississippi case bears directly on the sufficiency of DNA evidence alone, other jurisdictions have affirmed convictions based solely on DNA evidence. *See State v. Toomes*, 191 S.W.3d 122, 129-31 (Tenn. Crim. App. 2005); *Roberson v. State*, 16 S.W.3d 156, 169-71 (Tex. Ct. App. 2000); *Rush v. Artuz*, 2009 WL 982418, *11 (E.D.N.Y. April 10, 2009); *State v. Hunter*, 169 Ohio App.3d 65, 861 N.E.2d 898, 901 (2006); *State v. Abdelmalik*, 273 S.W.3d 61, 66 (Mo. Ct. App. 2008); *see also Maryland v. King*, --- U.S. ---, ---, 133 S.Ct. 1958, 1964, 186 L.Ed.2d 1 (2013) (emphasizing that DNA provides "unparalleled accuracy" and is "far superior" to fingerprinting with regard to identifying criminals). In accordance with those decisions, we conclude that, **when DNA material is found in a location inconsistent with casual contact and absent a "reasonable hypothesis consistent with innocence," DNA evidence alone can be sufficient to support a conviction.** We caution that we are not announcing a principle that DNA evidence alone will always be sufficient to support a conviction. Every conviction relying on DNA evidence must stand on its own merits.

*Id.* at 140 (emphasis added). The Court rejected Cotton's argument that touch DNA "could have" ended up under the victim's fingernails in a manner consistent with innocence and concluded that "after reviewing the evidence in the light most favorable to the prosecution," the evidence was sufficient to support the jury's guilty verdict. *Id.* at 142.

[¶54] In *State v. Carver*, 725 S.E.2d 902 (N.C. Ct. App. 2012), *aff'd*, 366 N.C. 372, 736 S.E.2d 172 (2013), a woman was found murdered beside her car near the Catawba River. Carver and his cousin had been fishing nearby and touch DNA with an extremely high probability of matching Carver's was found on the exterior of her car. Carver denied ever seeing the victim or touching her car. A jury found him guilty of first-degree murder. On appeal, Carver argued that there was insufficient evidence to prove that he had committed murder. *Id.* at 903-04. The appellate court disagreed, holding:

> Carver's denial [of seeing the victim and touching her car] and the DNA's contradiction thereof, viewed in the light most favorable to the State, are sufficient to establish that the DNA could only have been left at the time the offense was committed. . . . [T]he State presented sufficient evidence to identify Carver as the perpetrator by proving Carver's presence near the scene of the murder near the time of death in combination with his DNA-controverted statement that he never saw or touched the victim's car.

*Id.* at 905.

[¶55] Mr. Bean argues that the presence of his DNA can be explained by his innocent participation in events at Ms. Reher's party. Our standard of review requires us to disregard evidence in support of the appellant and to consider as true the evidence supporting the prosecution. *Andersen*, 2014 WY 88, ¶¶ 23-24, 330 P.3d at 263. That evidence includes the DNA test results and other evidence linking Mr. Bean to the crime and ruling out most other suspects. The presence of DNA consistent with Mr. Bean's on Ms. Reher's bra and underwear, as well as the inside waist of her pants, is not consistent with casual contact. The DNA evidence, when combined with Mr. Bean's explanation of the events after he left Ms. Reher's party, and his later comments: "If I was there, I don't remember[,]" and "If I did it, I don't remember[,]" along with reasonable inferences that can be taken from that evidence, are sufficient for a jury to have reasonably concluded that it was Mr. Bean who attempted to rape Ms. Reher.

## B. Intent

[¶56] Mr. Bean next argues that no evidence was presented at trial upon which a jury could infer he specifically intended to rape Ms. Reher. It is true that there was no direct evidence of intent introduced at trial.

> The rule is well-settled, however, that intent to commit a specific crime is not required to be proven by direct evidence but may be shown by circumstantial evidence. The mind of an alleged offender may be read from his acts, his conduct, his words and the reasonable inferences which may be drawn from the circumstances of the case.

*Jones v. State*, 568 P.2d 837, 845 (Wyo. 1977) (internal citations omitted). In fact, intent "is rarely capable of establishment by direct evidence," and "circumstantial evidence . . . most often is the only manner of proof available." *Montee v. State*, 2013 WY 74, ¶ 21, 303 P.3d 362, 366 (Wyo. 2013). "We have previously observed . . . that in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of facts is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia." *Benjamin v. State*, 2011 WY 147, ¶ 46, 264 P.3d 1, 12 (Wyo. 2011) (internal citation and quotation marks omitted); *see also Dryden v. State*, 535 P.2d 483, 496 (Wyo. 1975) (where victim "died as the result of a severe beating . . . [w]e think the jury could properly find that anyone who would commit such a brutal act possessed the intent and malice necessary to constitute" murder).

[¶57] The State claims that there was sufficient evidence to allow a reasonable jury to infer that Mr. Bean intended to rape Ms. Reher. The State's pathologist testified that the physical evidence at the scene of Sharon Reher's murder, including the state and location of her body and clothing, was consistent with sexual assault. The evidence also showed that a struggle had occurred prior to Ms. Reher's death. This evidence, when regarded in combination with the fact that Mr. Bean's DNA was consistent with DNA found in locations not compatible with casual contact and the other evidence discussed above, was sufficient to give rise to a reasonable inference that Mr. Bean intended to rape Ms. Reher.

## C. Fear of Imminent Peril

[¶58] Mr. Bean also takes the position that the State had to prove that Ms. Reher was in imminent fear of being raped and that it did not do so. While imminent fear of being raped was not an element of attempted rape, as that crime existed in 1972, *see* Wyo. Stat. § 6-64; *Sanchez*, 567 P.2d at 275, it was added in Instruction No. 12, which set forth the elements the State was required to prove to establish attempted rape. Mr. Bean proposed the instruction, and the State did not object. Instruction No. 12 provided in pertinent part:

The elements of the crime of ***Attempted Rape*** are:

1. On or between the 15th day of April 1972 to the 17th day of April 1972;
2. In Albany County Wyoming;
3. The Defendant, LANCE DAVID BEAN;
4. With the intent to commit ***Rape***, the elements of which are defined in Instruction #11;
5. With the present ability to commit ***Rape***, the elements of which are defined in Instruction #11;
6. ***Created a fear of imminent peril in SHARON REHER that she would be raped.***

(Emphasis added in item 6.)

[¶59] In his proposed instruction, Mr. Bean indicated that the "fear of imminent peril" element came from the case of *Rhodes v. State*, 462 P.2d 722, 727-28 (Wyo. 1969). In that case, the trial court instructed the jury that attempted rape had to occur "under circumstances creating a fear of imminent peril of being raped." *Id*. at 727. In *Rhodes*, the question before this Court was whether that instruction was prejudicial because it did not include an element of intent to commit rape. We held that it was erroneous, misleading, and prejudicial to the defendant, and we reversed. *Id*. at 728. We did not consider, however, whether fear of imminent peril was an element of attempted rape. The statute and other case law make it clear that fear of imminent peril is not an element of attempted rape. *See* Wyo. Stat. § 6-64; *Sanchez*, 567 P.2d at 275. There is no dispute, however, that this element was included as an element of attempted rape in Jury Instruction No. 12.

[¶60] Mr. Bean argues that there was no proof by which Ms. Reher's fear could be ascertained. Before we reach the merits of this argument, we must decide how to address a sufficiency challenge on an element that was added to the charged crime by the jury instruction. In *Sanchez v. State*, 751 P.2d 1300 (Wyo. 1988), we addressed a similar issue. There, the district court had instructed the jury on the elements the State was required to prove to establish first-degree sexual assault. The statute listed the elements in the disjunctive, that is, proof of any one of the elements would establish sexual assault. *Id*. at 1308. The jury instruction, however, listed the elements in the conjunctive, requiring proof of every element. *Id*. We held that because the defendant failed to object to the instruction at trial, the instructions became law of the case and would prevail unless plain error could be shown. *Id.* at 1308. We observed that

> [a]t the very least, the court's characterization of the elements of the offense afforded appellant greater protection, in that the state was required to prove more facts to meet its burden of

24

> proof than is usually true in a first degree sexual assault case. Even with this additional burden the state proved its case sufficiently for the jury to find appellant guilty.

*Id.*

[¶61] Upon close examination, we conclude that our reliance on the law-of-the-case doctrine in *Sanchez* was misplaced. "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, --- U.S. ---, ---, 136 S.Ct. 709, 716, 193 L.Ed.2d 639 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506, 131 S.Ct. 1229, 1250, 179 L.Ed.2d 196 (2011)).

> The doctrine "expresses the practice of courts generally to refuse to reopen what has been decided," but it does not "limit [courts'] power." *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). Thus, the doctrine may describe an appellate court's decision not to depart from a ruling that it made in a prior appeal in the same case. See C. Wright et al., 18B Federal Practice and Procedure § 4478, p. 646, and n. 16 (2d ed. 2002) (collecting cases). But the doctrine is "something of a misnomer" when used to describe how an appellate court assesses a lower court's rulings. *United States v. Wells*, 519 U.S. 482, 487, n. 4, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). An appellate court's function *is* to revisit matters decided in the trial court. When an appellate court reviews a matter on which a party failed to object below, its review may well be constrained by other doctrines such as waiver, forfeiture, and estoppel, as well as by the type of challenge that it is evaluating. But it is not bound by district court rulings under the law-of-the-case doctrine. That doctrine does not bear on how to assess a sufficiency challenge when a jury convicts a defendant after being instructed—without an objection by the Government— on all charged elements of a crime plus an additional element.

*Musacchio*, 136 S. Ct. at 716 (emphasis in original). Thus, the law-of-the-case doctrine does not apply here to require this Court to review the State's proof of an element that was erroneously added to the jury instructions. To the extent that *Sanchez* would imply otherwise, it is overruled. The question remains, however, as to how to address a

25

sufficiency challenge on an element that was added to the charged crime by the jury instruction.[6]

[¶62] The United States Supreme Court recently provided guidance on this issue. In *Musacchio*, the government failed to object to a jury instruction that erroneously added an element to the crime charged. 136 S.Ct. at 713. The Court held that "when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Id*. at 715. The Court reasoned:

> Sufficiency review essentially addresses whether "the government's case was so lacking that it should not have even been submitted to the jury." *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (emphasis deleted). . . . The reviewing court considers only the "legal" question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [*Jackson v. Virginia*, 443 U.S. 307,] 319, 99 S.Ct. 2781[, 2789, 61 L.Ed.2d 560 (1979)] (emphasis in original). That limited review does not intrude on the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.*

*Musacchio*, 136 S.Ct. at 715.

[¶63] The Court explained why on review for sufficiency of the evidence the reviewing court can disregard an extra element of proof in a jury instruction:

> A reviewing court's limited determination on sufficiency review thus does not rest on how the jury was instructed. When a jury finds guilt after being instructed on all elements of the charged crime plus one more element, the jury has made all the findings that due process requires. . . . The Government's failure to introduce evidence of an additional element does not implicate the principles that

---

[6] Where the trial court fails to instruct the jury on an essential element of a crime, we have held that "a trial court's failure to instruct on an element of a crime is not a fundamental error requiring automatic reversal, but rather a trial-type error subject to harmless error analysis." *Jones v. State*, 2011 WY 114, ¶ 14, 256 P.3d 527, 532 (Wyo. 2011) (citing *Granzer v. State*, 2008 WY 118, ¶ 18, 193 P.3d 266, 271-72 (Wyo. 2008)).

26

sufficiency review protects. ***All that a defendant is entitled to on a sufficiency challenge is for the court to make a "legal" determination whether the evidence was strong enough to reach a jury at all.*** [*Jackson v. Virginia*, 443 U.S. 307,] 319, 99 S.Ct. 2781[,2789, 61 L.Ed.2d 560 (1979)]. The Government's failure to object to the heightened jury instruction thus does not affect the court's review for sufficiency of the evidence.

*Musacchio*, 136 S.Ct. at 715 (emphasis added). We agree with this analysis.

[¶64] Because "imminent fear" is not one of the statutory elements of attempted rape, we will not consider whether the State provided evidence as to that additional element. The State's introduction or failure to introduce evidence on that element is irrelevant to a legal determination of whether a jury could reasonably find Mr. Bean guilty of attempted rape. Therefore, Mr. Bean's argument regarding proof of Ms. Reher's "imminent fear" is unavailing.

[¶65] Examining the evidence in the light most favorable to the State, we find that there was sufficient evidence for a jury to make reasonable inferences about Mr. Bean's identity and state of mind and to support the jury's verdict finding Mr. Bean guilty of attempted rape. The district court did not err when it denied Mr. Bean's motions for judgment of acquittal.

## *CONCLUSION*

[¶66] DNA test results in this case were not so unreliable as to be inadmissible. Issues of contamination, secondary transfer, and whether the police followed adequate collection protocols went to the weight of the evidence and were properly presented to the jury. The district court did not abuse its discretion when it denied Mr. Bean's motion to exclude DNA test results. Further, when viewing the evidence in the State's favor, there was sufficient evidence to support Mr. Bean's conviction and the district court's denial of his motions for judgment of acquittal. Affirmed.