# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 121

APRIL TERM, A.D. 2015

*September 15, 2015*

CURTIS RUSSELL OLDMAN,

**Appellant
(Defendant),**

**v.**

S-15-0002

THE STATE OF WYOMING,

**Appellee
(Plaintiff).**

*Appeal from the District Court of Fremont County
The Honorable Norman E. Young, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

*Representing Appellee:*
> Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Joshua C. Eames, Assistant Attorney General; Lisa Marie Jerde Spillman, Assistant Attorney General; Darrell D. Jackson, Faculty Director, A. Walker Steinhage, Student Director, and Geoffrey T. Cunningham, Student Intern, of the Prosecution Assistance Program. Argument by Lisa Marie Jerde Spillman.

*Before BURKE, C.J., and DAVIS, FOX, JJ., and GOLDEN, J., (Ret.), and KAUTZ, D.J.\**

*\* Justice Kautz was a district judge at the time of oral argument. He was sworn in as a Justice on August 4, 2015.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GOLDEN**, Justice (Ret.)

[¶1]    A jury found Curtis Russell Oldman guilty of conspiracy to commit robbery.  Mr. Oldman has appealed that conviction, claiming the State failed to present sufficient evidence of that conspiracy and the State engaged in prosecutorial misconduct in both its opening statement and closing argument by misleading the jury by using the phrase "if he was there, he was aware" to suggest that Mr. Oldman's mere presence at the scene of the robbery was sufficient evidence to prove the "agreement" element of the crime of conspiracy.  As we shall explain in the following discussion, we find no error and affirm Mr. Oldman's conviction and sentence.

## ISSUES

[¶2]    Mr. Oldman presents these issues for our consideration:

> I.      Was sufficient evidence presented to support a conspiracy conviction?
>
> II.     Did the prosecutors commit misconduct?

## DISCUSSION

## I.      Sufficiency of the Evidence

[¶3]    Mr. Oldman and the State inform us that the only issue at trial was whether 27-year-old Mr. Oldman conspired with his 16-year-old brother, A.S., to commit robbery.  There is no question that A.S. committed the robbery of the victim shortly after 4:30 p.m., November 10, 2013, in the parking lot at the Walmart store in Riverton, Wyoming.  The only issue at trial was whether Mr. Oldman conspired with A.S., as that term is understood in Wyoming criminal law.  Our conspiracy statute provides that a person is guilty of conspiracy to commit a crime if he **agrees** with another person that one of them will commit a crime and one of them does an overt act to effect the objective of the agreement.  Wyo. Stat. Ann. § 6-1-303(a) (LexisNexis 2015).

[¶4]    In *Remmick v. State*, 2012 WY 57, 275 P.3d 467 (Wyo. 2012), we stated:

> For a conspiracy conviction to be sustained, "the evidence must show beyond a reasonable doubt that the parties to the conspiracy voluntarily agreed to commit an offense." *Martinez v. State*, 943 P.2d 1178, 1183 (Wyo. 1997).

1

In *Smith v. State*, 902 P.2d 1271 (Wyo. 1995), we considered what type of agreement was necessary for a conspiracy to exist.

"One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement. . . .

Because most conspiracies are clandestine in nature, the prosec[u]tion is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.'"

902 P.2d at 1281-82 (quoting WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., CRIMINAL LAW at 460-61 (1972)).

*Martinez*, 943 P.2d at 1183.

*Remmick*, ¶ 30, 275 P.3d at 473.

[¶5]    To determine the sufficiency of the evidence proving the agreement between Mr. Oldman and A.S., his younger brother, we apply the appropriate standard of review:

Our standard of review is simple and established when a determination is challenged on the basis of the sufficiency of the evidence. We examine whether the evidence most favorable to the State is sufficient to infer reasonably that a statute was violated as charged. *See Mendicoa v. State*, 771 P.2d 1240, 1243 (Wyo. 1989); *Seeley v. State*, 715 P.2d 232, 240-41 (Wyo. 1986); *Chavez v. State*, 601 P.2d 166 (Wyo.

2

1979); and *Cheng v. Com.*, 240 Va. 26, 393 S.E.2d 599, 608 (1990). Our examination involves a two stage process.

When examining if the verdict is supported by sufficient evidence, we review the record to examine "all the evidence in the light most favorable to the [s]tate * * *." *Mendicoa*, 771 P.2d 1243. We examine the evidence from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt. We are aware the defendant's version argued for a finding of "not guilty" while the prosecutor's version argued for a finding of "guilty." Had the jury found the defendant's version credible, they would be bound to harbor reasonable doubt against the prosecutor's claim that the defendant was guilty. But they did not find the defendant's version credible and therefore found him guilty beyond a reasonable doubt. We do not ask if "'the evidence establishes guilt beyond a reasonable doubt for us * * *,'" *Id.* at 1243 (quoting *Broom v. State*, 695 P.2d 640, 642 (Wyo. 1985)), because the answer to that question would require this court to weigh the evidence and determine who was most credible. That determination simply is not a function of this court. "[W]e are not to reweigh the evidence." *Broom*, 695 P.2d at 641.

Second, after drawing into the open only the evidence adverse to the defendant, we examine whether that evidence permits the jury's inference that the defendant violated the elements of the statute as charged. Our focus is singular and only examines the **reasonableness of the inference** from premises admittedly adverse to the defendant. *See Broom*, 695 P.2d at 642.

*Rathbun v. State*, 802 P.2d 881, 882-83 (Wyo. 1990) (emphasis in original); *accord Remmick*, ¶ 24, 275 P.3d at 472.

[¶6] Our careful examination of the trial transcript reveals the following evidence most favorable to the State and adverse to Mr. Oldman:

1.      On the afternoon of November 10, 2013, Tiesha Underwood was driving her mother's silver two-door Monte Carlo with her young sister, S.U., as a passenger. They picked up Tiesha Underwood's boyfriend of almost eight years, Mr. Oldman, age

27, and his younger brother, A.S., age 16, at Mr. Oldman's mother's trailer on 17 Mile Road.

2.  When Tiesha Underwood picked them up at that trailer, A.S. had two guns with him when he got into the Monte Carlo.

3.  The four of them drove to Game Stop in Riverton to sell or pawn some iPods to get some money. Mr. Oldman's brother, A.S., went into Game Stop first with the iPods and then returned to the car and told Mr. Oldman that Game Stop would only give them a couple of dollars for the iPods. Mr. Oldman then went into Game Stop to retrieve the iPods and then returned to the car.

4.  When Mr. Oldman returned to the car, he said, "Damn, what do we do now."

5.  In Tiesha Underwood's interview with Detective Todd Byerly on November 11, 2013, the day after the robbery when she was in the detention center in Lander, when asked, "When you left Game Stop, what was your plan at Walmart? What was talked about from leaving Game Stop?", she replied, "[A.S.] was just going to go grab a purse or something while we take off. Whatever."

6.  As they drove the two blocks from Game Stop to the Walmart parking area, Ms. Underwood was the driver, Mr. Oldman was in the front passenger seat, and A.S. and S.U. were in the back seat.

7.  When they arrived at the Walmart parking area, they drove around various locations while looking for a parking space in the north area of the parking lot near the entry/exit of the Walmart grocery.

8.  Walmart had three surveillance video cameras which filmed the actions of Mr. Oldman, A.S., and Tiesha Underwood as they drove around the parking lot and then parked at a spot near the grocery entrance/exit in the area where the robbery occurred.

9.  As the jury watched the video film captured on Walmart's surveillance cameras, Detective Todd Byerly described to the jury the actions of Mr. Oldman and A.S. shown by that film. The State's prosecutors and Mr. Oldman's defense counsel stipulated that the two persons shown on the film were Mr. Oldman and A.S.

10. Detective Byerly's description of the actions of Mr. Oldman and A.S. was as follows:

-- at 4:31:27 seconds, the Monte Carlo is visible.
-- at 4:32.01 seconds, a male subject has exited the car's passenger side.

-- at 4:32:09 seconds, Mr. Oldman and A.S. are standing outside the car.

-- between 4:32:09 seconds and 4:33:06 seconds, one of the subjects appears "to get inside the car, lean into the car . . . it does appear he leans into the vehicle for something."

-- at 4:32:21 seconds, both men are standing outside the car and "it appears that [they] are having a conversation or actively engaging in something between the two of them."

-- at 4:33:06 seconds, Mr. Oldman and A.S. are standing outside the car and the robbery victim is now visible.

-- at 4:33:15 seconds, the robbery victim is visible and is pushing a grocery cart and holding her purse as she walks toward her car.

-- at 4:33:15 seconds, Mr. Oldman is standing at the Monte Carlo's passenger side door area, and A.S. is moving abruptly towards the robbery victim as she is approaching her car. Mr. Oldman watches A.S. for twelve seconds as A.S. walks toward the robbery victim.

-- at 4:33:33 seconds, A.S. is walking toward the robbery victim.

-- at 4:33:40 seconds, the robbery victim is toward the rear of her car and A.S. is near her car.

-- from 4:33:40 seconds to 4:34:00 seconds, A.S. has reached the robbery victim and is holding a gun to her head and has her purse.

-- at 4:34:06 and 07 seconds, the robbery victim is at the rear of her vehicle and A.S. is running back toward the Monte Carlo with the robbery victim's purse.

-- Det. Byerly stated that it was less than a second from A.S.'s reaching the Monte Carlo to that car driving away.

11. A.S. testified that when he and Mr. Oldman were standing outside the Monte Carlo before he started walking toward the robbery victim, A.S. told Mr. Oldman that he was going to get a bag and to get in the back seat.

12. Lily Schamp and her fiancé were walking toward the grocery entrance of Walmart when they saw a young Native American man running toward and then getting into the Monte Carlo and watched it drive away fast.

13. The robbery victim testified about the robbery: As she left Walmart with her grocery cart and purse and reached her car's passenger door, a young Native American man came around the back of her car and pointed a gun at her, saying, "Give me your money. Give me your money." He told her he would shoot her if she didn't give him her purse. He grabbed her purse and ran. She saw him running toward a car which was the Monte Carlo. She saw a young couple, Mrs. Schamp and her fiancé, and asked them to call 911.

14. Riverton Police Officer Luton received the call about the robbery, the description of the Monte Carlo, and the direction the car was going. She then spotted the

5

car and pursued it, having activated her car's lights and siren. The car did not stop, but accelerated upwards of 70 miles per hour. She caught up to the car at 17 Mile Road and followed it to Mr. Oldman's mother's trailer. The Monte Carlo stopped. Two male subjects got out of the Monte Carlo and ran into a nearby field. Other law enforcement officers, who had followed Officer Luton's pursuit of the Monte Carlo, arrived and pursued the two males and caught them. Officer Luton talked to S.U., who was seated in the Monte Carlo, and was told by her that the two male subjects had taken the two guns into the weeds. The guns, a purse (later identified as the robbery victim's), and a bandana were recovered in the field.

15. Officer Ron Cunningham had followed Officer Luton as she pursued the Monte Carlo, and he arrived on the scene as A.S. and Mr. Oldman jumped out of the Monte Carlo and started running across a field. He gave chase and caught Mr. Oldman. Mr. Oldman spoke to Officer Cunningham, stating his date of birth and saying something to the effect of "if you want -- it's your job to figure out anything further, or anything more."

[¶7] Following the close of testimony and before the State and Mr. Oldman's defense counsel gave their respective closing arguments, the trial judge read the jury instructions which the jury would follow when deliberating the jury's verdict. Jury Instruction No. 4 instructed in relevant part:

> The jury is the sole judge of the credibility of the witnesses and of the weight to be given their testimony. In so doing, you may take into consideration all the facts and circumstances in the case, and give to each such weight as in the light of your experience and knowledge of human affairs you think it entitled.
>
> In judging the credibility of the witnesses in this case, you should take into consideration their demeanor upon the witness stand, their apparent degree of intelligence, their means of knowledge of the facts testified to, their interest, if any, in the outcome of this trial, and their revealed motives or prejudice or feelings of revenge, if any have been shown by the evidence in this case.
>
> If you believe from the evidence in this case that any witness willfully and corruptly swore falsely to any material fact in this case, then you are at liberty to disregard all or any part of that testimony, except insofar as the same has been corroborated by other and credible evidence and the facts and circumstances proven during the trial.

6

. . .

> . . .[Y]ou may consider the evidence presented to you and the reasonable inferences and conclusions which may be drawn therefrom in the light of your knowledge, observation and experience in the affairs of life.

[¶8]    In our careful examination of Tiesha Underwood's trial testimony, the jury heard her state that Mr. Oldman, her boyfriend of nearly eight years, did not get out of her car as A.S. had at Walmart but remained seated in her car.  Her testimony was in contrast to both Mr. Oldman's testimony and A.S.'s testimony as well as the Walmart surveillance camera film.  She also testified that she did not want Mr. Oldman to go to prison.

[¶9]    In our careful examination of Mr. Oldman's trial testimony, the jury heard him testify that, while he and A.S. were outside that car at Walmart, neither of them leaned into the car; yet the jury saw that one of them had leaned into the car as the jury viewed the Walmart surveillance camera film.  The jury heard Mr. Oldman testify that, when he and his companions left the Walmart parking area, they were not going fast.  This was in stark contrast to Ms. Schamp's testimony that the car was going fast when she called 911 after the robbery victim told her what had just happened.  The jury heard Mr. Oldman testify that he did not know that A.S. had robbed the victim's purse until "way afterwards" a day or two later when he was questioned in the detention facility and heard it on television; he was surprised to hear that his brother had done that.  In contrast, the jury heard Officer Luton testify that she pursued Oldman's car with flashing lights and siren at speeds reaching 70 miles per hour.  Also in contrast with Mr. Oldman's testimony was the testimony of Officer Cunningham, who chased and caught Mr. Oldman as he fled from the car.

[¶10]  It is true that the State's case was largely a circumstantial one.  It is also true that the jury could perhaps have concluded that Mr. Oldman was an innocent, naïve 27-year-old caught in the toils of a bold daylight purse snatching committed by his 16-year-old brother after both of them could not get any money for their iPods at Game Stop.  Yet that possibility does not call for reversal in this case.  On this record, what counts is that the jury was justified to believe that the converging circumstances pointed toward a more sinister truth and was persuaded by those circumstances of Mr. Oldman's agreement with his brother that he commit the robbery in question.  "And that conclusion, once reached, would be self-reinforcing; if the jury disbelieved [the defense] story, it could legitimately have presumed that the fabrication was all the more proof of" Mr. Oldman's guilt. *United States v. Jimenez-Perez*, 869 F.2d 9, 11 (1st Cir. 1989).

[¶11]  We conclude that there was sufficient evidence for a jury to find an agreement between Mr. Oldman and his brother A.S. and on that basis to convict Mr. Oldman of conspiracy to commit robbery.

## II.     Prosecutorial Misconduct

[¶12]  Mr. Oldman claims that prosecution counsel, in opening statement and in closing argument, misled the jury on what evidence is required to prove the element of agreement in Wyoming conspiracy law.  He identifies several instances in the prosecution's opening statement and closing argument where counsel used the mantra "if he was there, he was aware."  He argues that this mantra suggested that the jury should find Mr. Oldman's guilt based upon his mere presence during the events surrounding the robbery.  He states that because his trial counsel did not object to these misstatements of the law, this Court applies its plain error standard of review.

[¶13]  In *Ortiz v. State*, 2014 WY 60, 326 P.3d 883 (Wyo. 2014), we stated:

> "The general rule in Wyoming is that a failure to interject a timely objection to an allegedly improper argument is treated as a waiver, unless the misconduct is so flagrant as to constitute plain error and require reversal." *Armstrong v. State*, 826 P.2d 1106, 1115 (Wyo. 1992) (citing *Jeschke v. State*, 642 P.2d 1298, 1301 (Wyo. 1982)).  Because there was no objection at trial, this Court reviews Mr. Ortiz's allegations of prosecutorial misconduct for plain error. *Maier* [*v. State*], 2012 WY 50, ¶ 20, 273 P.3d [1084,] 1090 [(Wyo. 2012)].  Plain error exists when:  "1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Sweet v. State*, 2010 WY 87, ¶ 22, 234 P.3d 1193, 1202 (Wyo. 2010).  Reversal as a result of prosecutorial misconduct is not warranted unless a reasonable probability exists that absent the error the defendant may have enjoyed a more favorable verdict. *Haynes v. State*, 2008 WY 75, ¶ 23, 186 P.3d 1204, 1210 (Wyo. 2008).

*Ortiz*, ¶ 104, 326 P.3d at 903.

[¶14]  The prosecution's opening statement occupies ten pages of the record.  At the beginning of that statement, prosecution counsel stated, "Ladies and gentlemen, if he was there, he was aware.  I'll get to what that means as I continue."  For the next ten pages of this opening statement, prosecution counsel walked the jury through the prosecution's case in considerable detail, much as we have set out hereinabove in our review of the sufficiency of the evidence.  As prosecution counsel neared the end of his lengthy statement, he told the jury:

Well, ladies and gentlemen, that's what we have here. The officers have all investigated, and they have figured out what happened. That's what we will be presenting to you.

. . .

So after you hear all this, we'll ask you to find Mr. Oldman guilty of conspiracy to commit robbery . . . . And, like I said before, if Mr. Oldman was there, he was aware. He knew what was happening, and he was a part of it.

[¶15] At this point, defense counsel objected, stating:

Counsel is misinforming the jury as to the law. . . . [T]here's going to be an instruction that says that mere presence is not enough to show conspiracy, and yet Counsel is intimating that just his mere presence is enough to show there is a conspiracy.

[¶16] The trial judge then stated:

Well, it's an interesting little area of the law that there's some recent case law on, and I'm going to sustain the objection and ask that the jury disregard that statement as possibly being an improper statement of the law.

[¶17] Defense counsel then made his brief opening statement to the jury to the effect that Mr. Oldman had no notion that his brother was going to rob someone, he didn't agree that it should happen, and he didn't encourage it to happen. He concluded by stating that the prosecution was not going to be able to show that Mr. Oldman knew or agreed or encouraged his brother to rob the victim.

[¶18] We have considered the prosecutor's phrase in the context of his entire opening statement; we have noted that defense counsel did not object when that phrase was first spoken; we have noted that when defense counsel objected to the phrase at the close of the prosecutor's opening statement, the trial court sustained that objection and instructed the jury to disregard the phrase as possibly being an improper statement of the law. In our considered judgment, the prosecutor's scant use of the phrase in the context of the entire opening statement was not flagrant and the trial judge's admonition to the jury to disregard the phrase was sufficient to remedy the situation. We find no error.

9

[¶19]  Mr. Oldman also claims that prosecution counsel used the phrase "if he was there, he was aware" at several points during closing argument, but Mr. Oldman concedes that his defense counsel did not object at any time to that usage.  The prosecution's closing argument, including rebuttal, occupies twenty-three pages of the record.   In that argument, prosecution counsel, as he had done in opening statement, walked the jury through the prosecution's case in considerable detail, again much as we have set out hereinabove in our review of the sufficiency of the evidence.  We take note that the trial judge had instructed the jury at the beginning of the trial that it was his exclusive province to instruct the jury as to the law applicable to the case.  We also take note that, before prosecution counsel began his closing argument, the trial judge read his instructions on the applicable law to the jury which included the principle that "merely being present at the place where the crime takes place" does not of itself make someone a member of the conspiracy or a conspirator.  We also take note that Mr. Oldman's counsel reminded the jury during his closing argument that the trial judge's instructions stated that mere presence was not enough to convict Mr. Oldman.  Finally, we note that in prosecution counsel's rebuttal closing argument, he reiterated that mere presence was not enough to convict Mr. Oldman and that the trial judge's instructions would guide them on that point.  We find no error here.

[¶20]  We affirm Mr. Oldman's conviction and sentence.