# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 6

OCTOBER TERM, A.D. 2025

January 13, 2026

STEVE BRANDON BROWN,

Appellant
(Defendant),

v.

S-25-0108

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Uinta County*
*The Honorable James C. Kaste, Judge*

***Representing Appellant:***
Office of the State Public Defender: Brandon T. Booth, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

***Representing Appellee:***
Keith G. Kautz, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

***Before BOOMGAARDEN, C.J., and GRAY, FENN, and JAROSH, JJ., and COOLEY, D.J.***

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Steve Brandon Brown was convicted on two counts of witness intimidation in violation of Wyo. Stat. Ann. § 6-5-305(a), based on statements he made during a supervised visit with his daughters and a Facebook post.  Mr. Brown contends the convictions violated his First Amendment free speech rights and that there was insufficient evidence for a jury to reasonably conclude that he issued threats in an attempt to influence, intimidate, or impede his daughters in relation to their duty as witnesses.  We agree with Mr. Brown that his convictions were not supported by sufficient evidence and reverse.  We do not reach the First Amendment question.

*ISSUE*

[¶2]    Did the State present sufficient evidence to support Mr. Brown's convictions for attempt to intimidate witnesses by issuance of a threat in violation of Wyo. Stat. Ann. § 6-5-305(a)?

*FACTS*

[¶3]    Mr. Brown was charged with two counts of witness intimidation under Wyo. Stat. Ann. § 6-5-305(a), which makes it a felony to "by force or threats" "attempt[] to influence, intimidate or impede a . . . witness . . . in the discharge of his duty."  Wyo. Stat. Ann. § 6-5-305(a) (LexisNexis 2023).  The charges emanated from a conversation Mr. Brown had with his daughters, 14-year-old DB and 11-year-old AB, on March 19, 2024, and a Facebook post Mr. Brown made later that day.  At that time, DB and AB were residing at an Evanston, Wyoming Youth Alternative Home Association (YAHA), where Mr. Brown had supervised visits with the girls.

[¶4]    Mr. Brown had a scheduled visit on March 19.  At trial, DB testified that she did not want to visit her father on that day.  She also testified that Mr. Brown told her he would take the tablet he had given her if she refused to visit with him.  DB explained that Mr. Brown knew her tablet "was a big part of [her] life" and she attended the visit because she did not want to lose it.  Other than the threat to take her tablet, DB could not recall any other threat or intimidation directed at her by Mr. Brown on March 19.  DB went on to say that on a different occasion, Mr. Brown had said he would take DB and AB away from YAHA and that she liked YAHA and did not want to leave.  She also testified that "sometimes over the phone [Mr. Brown] would tell [DB and AB] to tell the Court that [they] wanted to go home.  But [they] never did."  DB also testified that she was afraid to go with Mr. Brown.  When she was questioned as to whether she remembered she had to appear in court a couple of days after the March 19 visit, DB testified, "Yes.  I'm not sure."

[¶5]    AB testified she did not really remember the March 19 visit.  After reading the police report to refresh her recollection about her father's visit on the day in question, AB testified

1

she did not think she wanted to visit with her father that day. AB stated that her father "was acting a little off" during the visit, but she did not remember Mr. Brown saying anything that caused her concern. She described the conversation as her father "just talking about how he doesn't want his kids to be taken away and he thinks it's stupid that we're in YAHA right now." She remembered that Mr. Brown had asked the question "how [would you] feel if somebody took your kids away?" She did not think the question was directed at her and thought it was probably aimed at Juliette Mendez, the YAHA employee who attended the visit. AB testified she was worried that her father would do something and end up in jail. She then clarified that she did not think he would do anything but that he could be scary. AB did not recall that she was supposed to appear in court a couple of days after the visit.

[¶6] The prosecution asked AB if her father said anything to her that she thought was threatening to anyone. AB responded, "I don't remember if it's this visit—the visit that we're talking about right now. So, no." When pressed as to whether her father's visit impacted her while she was in court, she explained:

> Q. [(Prosecutor)] In relation to when you would come to court, did you ever feel like you shouldn't say things to the judge about your dad?
>
> A. [(AB)] I feel like—I think I was just too scared to say anything.
>
> Q. And why would you be scared?
>
> A. Because my dad is going to yell at me.
>
> Q. And when he had these visits like this day when you said he was off, did that scare you about what could happen in court?
>
> A. Can you repeat the question?
>
> Q. When you had this visit with your dad, you said he was "off," right?
>
> A. Yeah.
>
> Q. You said that he was acting in a way that caused you to worry? Yes?
>
> A. Yes.

2

Q. Is that anything that you would have in mind when you were here in court?

A. No.

Q. Why not?

A. I thought—I just thought he was kind of off that one day.

[¶7]    Juliette Mendez testified that she was present during the March 19, 2024 visitation. According to Ms. Mendez, DB and AB did not want to visit with their father, and they were "standoffish and not engaged" during the visit.  Ms. Mendez explained that Mr. Brown was upset with the girls because they were not paying attention to him during the visit.  According to Ms. Mendez, Mr. Brown made threats, "[s]aying [DFS] took his kids away and that he can take theirs away."  AB responded to the comment by saying "[w]e don't even have kids" and calling Mr. Brown a bully.  Ms. Mendez also testified Mr. Brown said "he has a right to bear arms" and the girls did not "react to that at all."  Ms. Mendez cut the visit short at this point.  Ms. Mendez stated that she was "in disbelief" and she felt that Mr. Brown *threatened the State and, by implication, her, because she worked for the State*.

[¶8]    Kristie Mahatha, a youth development specialist at YAHA, also testified.  Like Ms. Mendez, she testified that when Mr. Brown arrived, his daughters did not want to visit with him and that Mr. Brown said he would take the tablet away if they did not visit with him.  She said neither girl wanted to meet with Mr. Brown and described them both as "off-standish [sic]."  She reported that Mr. Brown was "kind of in an upset mood" and described his statements to the girls as "[w]henever you have kids, I'll take them" and "[w]hat would you do if you had kids and I took them?"  According to Ms. Mahatha, AB responded, "We don't have kids.  What do you mean?"  She also testified that Mr. Brown said he had "a right to bear arms, and he [would] do so to get his kids back."  AB responded by calling him a bully.  At that point, the visit was terminated.  Ms. Mahatha testified that after the visit, the girls were crying and both seemed scared.

[¶9]    Later that day, Ms. Mahatha looked at Mr. Brown's Facebook page because he had "a history of venting onto Facebook" and she was curious as to what he would say.  She testified that she found the following post made by Mr. Brown:

> I'm not sure who I'm pointing this at.  What the heck is wrong with people?  Sleeping is a nightmare.  All of my emotions come out in my dreams, screaming for my kids.  And why? Why the – would somebody take somebody's kids?  The sober man is a different me.  It's the one that fights.  It's the one that feels.  It's the one that will kill you and your whole family.  It's

the one that will take on the world or start a revolution. It's the most dangerous thing you've ever seen. You don't take somebody's kids without right. And I say this with everything in me. Wouldn't you like to know who you are? I see about nine billion of them. That's what I'm going to do. You have to start with one, though. I don't hide behind paperwork. I will stand behind a sight. . . . Put me behind an assault rifle, and there's a reason. Is – there are ten for every person in Wyoming. I don't need . . . . Now you've been warned, and somebody stepped too far. Arrest me for speaking my mind in doing the right thing as a father. You won't be able to keep me in forever, and then you have a real problem. . . . I'm not going to have it at home for the community that I serve that take my kids. Lives for lives. That's the way the world works. Or didn't you just get the memo? I could make some phone calls.

After she saw the Facebook post, Ms. Mahatha spoke with her supervisor and then reported the incident to the police. The girls had no access to social media and did not see this post or any of Mr. Brown's Facebook posts.

[¶10] In addition to this evidence, the jury was provided an instruction indicating:

There were independent, confidential, Child in Need of Supervision, or CHINS, cases for each of DB and AB in the juvenile court. There were no allegations of delinquency, abuse, or neglect as the basis for the juvenile proceedings.

However, both DB and AB had been placed in State's custody since November of 2023, with constructive placement at the Youth Alternative Housing Association. Each child was scheduled to attend and address the Court for a placement review hearing on March 21, 2024.

[¶11] The jury returned guilty verdicts on both counts of witness intimidation under Wyo. Stat. Ann. § 6-5-305(a). The district court sentenced Mr. Brown to concurrent terms of imprisonment of not less than four, nor more than eight years on both counts. Mr. Brown appealed.

## *DISCUSSION*

***Did the State present sufficient evidence to support Mr. Brown's convictions for attempt to intimidate witnesses by issuance of a threat in violation of Wyo. Stat. Ann. § 6-5-305(a)?***

4

[¶12]  Mr. Brown contends there was insufficient evidence at trial to support the jury's findings that he was guilty of two counts of attempt to intimidate a witness in the discharge of her duty.

## A.  Standard of Review

[¶13]  When we review a claim of insufficiency of the evidence, we "examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it." *Bean v. State*, 2016 WY 48, ¶ 44, 373 P.3d 372, 386 (Wyo. 2016) (quoting *Andersen v. State*, 2014 WY 88, ¶ 23, 330 P.3d 256, 263 (Wyo. 2014)); *see also Toth v. State*, 2015 WY 86A, ¶ 15, 353 P.3d 696, 702 (Wyo. 2015).  We do not consider conflicting evidence presented by the defendant.  *Bean*, ¶ 44, 373 P.3d at 386 (quoting *Andersen*, ¶ 23, 330 P.3d at 263).

[¶14]  "We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt.  This standard applies whether the supporting evidence is direct or circumstantial." *Bean*, ¶ 44, 373 P.3d at 386 (quoting *Andersen*, ¶ 23, 330 P.3d at 263 (quoting *Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738–39 (Wyo. 2012))).

> [A]fter drawing into the open only the evidence adverse to the defendant, we examine whether that evidence permits the jury's inference that the defendant violated the elements of the statute as charged.  Our focus is singular and only examines the **reasonableness of the inference** from premises admittedly adverse to the defendant.
>
> *Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 967 (Wyo. 2015) (emphasis in original) (citations omitted).
>
> We do not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder."  *Hill v. State*, 2016 WY 27, ¶ 13, 371 P.3d 553, 558 (Wyo. 2016) (citing *Levengood v. State*, 2014 WY 138, ¶ 12, 336 P.3d 1201, 1203 (Wyo. 2014)).  "We will not reweigh the evidence nor will we re-examine the credibility of the witnesses."  *Hill*, 2016 WY 27, ¶ 12, 371 P.3d at 558 (citation omitted).  We review the sufficiency of the evidence "from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence

adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Oldman*, 2015 WY 121, ¶ 5, 359 P.3d at 966.

*Bean*, ¶¶ 44–45, 373 P.3d at 387.

## B.    Analysis

[¶15]  The crime of felony "[i]nfluencing, intimidating or impeding . . . witnesses . . ." requires proof that by force or threats, the defendant attempted to influence, intimidate or impede a witness in relation to the discharge of the witness' duty.  Wyo. Stat. Ann. § 6-5-305(a).

### 1.  Witness Intimidation Is a Specific Intent Crime

[¶16]  We have previously held that attempted witness intimidation is a general intent crime.  In *Smith v. State*, 902 P.2d 1271, 1281 (Wyo. 1995), we explained, "It is apparent there is no articulation of any specific intent in Wyo. Stat. [Ann.] § 6-5-305(a)."  More recently, in *Black v. State*, 2020 WY 34, ¶ 44, 458 P.3d 1245, 1255 (Wyo. 2020), we noted that our discussion of attempted witness intimidation in *Smith* as it pertained to specific intent "is generally inconsistent with this Court's more recent interpretations of specific versus general intent crimes."  We did not reevaluate § 6-5-305(a) in *Black* because the issue was not raised by the parties.  Here, the State has invited the Court to abrogate its holding in *Smith* that attempted witness intimidation as defined by § 6-5-305(a) requires only general intent.  We accept that invitation.

[¶17]  "Generally, an attempted crime is a specific intent crime . . . because an attempt requires an intent to do some further act or create an additional consequence."  *Kite v. State*, 2018 WY 94, ¶ 23, 424 P.3d 255, 263 (Wyo. 2018).

> When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence the fact that the defendant intended to do the proscribed act makes that crime a general criminal intent offense.  When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.

*Kite*, ¶ 23, 424 P.3d at 263 (quoting *Sam v. State*, 2017 WY 98, ¶ 69, 401 P.3d 834, 857 (Wyo. 2017)).  Section 6-5-305(a)'s use of "attempts" requires specific intent to "influence, intimidate or impede" a witness "in the discharge" of her duty.  Witness intimidation, as proscribed in § 6-5-305(a), is a specific intent crime.

6

## 2. Sufficiency of the Evidence

[¶18]  Mr. Brown argues there was insufficient evidence produced at trial to support the jury's guilty verdicts on the charges of witness intimidation.  Specifically, he contends the State failed to introduce sufficient evidence to establish that he made a threat and that he attempted to intimidate either witness in relation to her duty to testify.

### a.  Existence of a Threat

[¶19]  The Information alleges that Mr. Brown intimidated witnesses, AB (Count I) and DB (Count II), on or about March 19, 2024.  Mr. Brown made four potential threats on March 19, 2024.  First, Mr. Brown asked how the girls would feel if he took their kids away.  Second, he made the statement that he had a right to bear arms.  Third, he posted a rant on his Facebook page, which contained generically threatening statements.  We will assume without deciding that evidence of these three threats was sufficient to support a conclusion that Mr. Brown made threats and that the State established the threat element of witness intimidation.  Wyo. Stat. Ann. § 6-5-305(a).

[¶20]  The fourth threat made by Mr. Brown was that he would take away DB's tablet if she did not agree to visit with him.  Mr. Brown argues that this threat is not the type of threat covered by the witness intimidation statute, Wyo. Stat. Ann. § 6-5-305.  The State clarified in its brief that it "never claimed that threatening to take a tablet qualified as a threat under § 6-5-305" and that it did not rely on this threat as a basis for the charges.  Accordingly, we conclude that this threat is not relevant to the charges in this case and focus on the other three.

### b.  Attempt to Intimidate in Relation to the Witnesses' Discharge of Their Duty

[¶21]  The State also bore the burden of proving Mr. Brown attempted to "influence, intimidate or impede" AB (Count I) and DB (Count II) in relation to their duty as witnesses.  Wyo. Stat. Ann. § 6-5-305(a).  The State argues that Mr. Brown's intent to intimidate DB and AB in relation to their duty to testify as witnesses in the CHINS matter necessarily requires proof by circumstantial evidence, and this element was established by inferences that the jury logically drew from surrounding facts and circumstances.  After viewing the evidence in the light most favorable to the State, we find no evidence, circumstantial or otherwise, that linked the threats to the participation of DB or AB as witnesses in the pending CHINS matter.  Accordingly, we conclude that a jury could not have reasonably concluded that Mr. Brown "attempt[ed] to influence, intimidate or impede" DB and/or AB "in the discharge of [their] duty" as witnesses.

[¶22]  Mr. Brown asked DB and AB how they would feel if he took their kids away, but nothing connects this question to the upcoming CHINS hearing or to an effort to intimidate

7

or discourage them from testifying or to an attempt to influence their testimony. DB did not testify regarding this comment. AB testified that she presumed that the comment was directed at the YAHA employees who were present during the visit. Neither of the YAHA employees connected this comment to the pending CHINS hearing or the girls' role as witnesses. In short, no evidence or logical inference links Mr. Brown's question to the roles of DB or AB as witnesses. The jury could not reasonably have found a nexus between this rhetorical question and the CHINS hearing.

[¶23] According to Ms. Mendez, Mr. Brown stated that he had a right to bear arms and he had a right to protect his kids. She first said the girls did not "react to that at all," but later testified that they were "scared." She perceived this statement as a threat against either her or the State. Ms. Mahatha testified that Mr. Brown said he had a right to bear arms, and he would use it to get his kids back. She said AB responded by calling him a bully. Ms. Mahatha testified that the girls were crying, and both seemed scared after the visit.

[¶24] While this statement prompted the early termination of the visit, neither Ms. Mendez nor Ms. Mahatha testified that they thought Mr. Brown's "right to bear arms" comment was connected to the upcoming CHINS hearing or the girls' potential roles as witnesses.

[¶25] Mr. Brown's Facebook post contained generically threatening statements, and his daughters never saw it. There was no testimony that Mr. Brown directed the post to his daughters. In fact, they had no access to Facebook. The post did not mention the CHINS hearing or DB's or AB's roles as witnesses. Perhaps Mr. Brown's comment that he had a right to bear arms could serve as circumstantial evidence of an intent to threaten the State or possibly the YAHA employees who attended his visit with his daughters, but the victims as identified in this case were DB and AB, not the State or the YAHA workers.

[¶26] Neither DB nor AB mentioned Mr. Brown's statement that he had a right to bear arms or his March 19 Facebook post during their testimony. DB did not connect any of the alleged threats to her participation as a witness in the CHINS matter. AB stated that her father could be scary, but she never connected that fact to her participation as a witness. AB did not recall that she was supposed to be in court a couple of days after the visit.

[¶27] The State argues the fact that the CHINS hearing was scheduled two days after the visit was enough to create a connection between the threats and the girls' participation as witnesses. The State cites *Smith v. State*. In *Smith*, Mr. Minick testified against Mr. Smith's sister in a criminal matter. *Smith*, 902 P.2d at 1273. Mr. Minick was released from his subpoena but stayed until the jury returned a verdict. *Id.* at 1273–74. About four hours later, sheriff deputies took him to the bus depot so he could catch a bus and return home. *Id.* at 1274. Mr. Smith told two of his coworkers that Mr. Minick had lied in court and got his sister in trouble. He offered them money and free beer if they would beat up Mr. Minick. One of them, Mr. Rhoden, took Mr. Smith up on his offer. Mr. Smith and Mr. Rhoden found Mr. Minick at the bus depot. Mr. Rhoden lured him outside and struck

him in the face. *Id.* Mr. Smith was charged with, and a jury convicted him of, conspiracy to intimidate a witness in violation of Wyo. Stat. Ann. §§ 6-5-305(a) and 6-1-303(a). *Id.* at 1273.

[¶28] On appeal, Mr. Smith argued that the evidence introduced at trial was insufficient to establish that Mr. Minick was a witness because he had been discharged of his duty. *Id.* at 1276. Mr. Smith contended that since Mr. Minick had been discharged from his subpoena and the trial had ended, he could not be a witness as required by the statute. *Id.* We disagreed, holding that "one can be a 'witness' both prior to being subpoenaed and after being discharged from the subpoena. The question is not whether one is under subpoena, but whether one has knowledge of material facts and is expected to be called to testify . . . ." *Id.* at 1280. We went on to explain:

> It is possible to visualize circumstances in which one would be a "witness," but any assault would be unrelated to the discharge of his duty. If, for example, a person who is a "witness" in some judicial proceeding were to be assaulted in an altercation which had no relationship to the judicial proceeding, such as a private quarrel over a property boundary, there would be no attempt to influence, intimidate, or impede the witness in the discharge of his duty. Such are not the facts in this instance, and **the relationship between the assault and battery and Minick's status as a "witness . . . in the discharge of his duty" is clear, in time, causation, and logic**. The assault and battery occurred on the same day within a few hours of Minick's testimony. Causation is demonstrated by the testimony of [the second coworker] who reported Smith claimed "a guy that had lied in court and got the sister into trouble and convicted her, whatever and they wanted me to beat [him] up." The logical relationship between Minick's status as a witness and the assault and battery also is clear.

*Id.* (emphasis added).

[¶29] Unlike *Smith*, where there was a causal relationship between the assault and battery and Mr. Minick's testimony, the relationship between Mr. Brown's threats and the girls' status as witnesses was not established. The CHINS hearing was scheduled for two days after the visit, but no connection between the threats and DB's and AB's status as witnesses was introduced. Standing alone, the timing of the CHINS matter is insufficient to create a causal link between Mr. Brown's threats and the duty of DB and AB as witnesses.

[¶30] In *Smith*, we noted that Ohio's witness intimidation statute is very similar to ours. *Smith*, 902 P.2d at 1276 (citing *Fisher v. McDaniel*, 9 Wyo. 457, 64 P. 1056 (1901), and

relying on Ohio caselaw). Ohio statutes prohibit "attempt[ing] to influence, intimidate, or hinder a public servant, party official, or witness in the discharge of the person's duty." *State v. Hodge*, 2020-Ohio-3002, ¶ 73, 154 N.E.3d 671, 689 (emphasis omitted) (quoting Ohio Rev. Code Ann. § 2921.03). In *Hodge*, after his arrest in an underlying matter, Mr. Hodge, threatened a sheriff deputy, saying he "should wait until Hodge catches him on the street" and that it was because of officers like him that other officers wear badges for slain officers. *Id.* at ¶ 72, 154 N.E.3d at 689. He was charged and convicted of intimidation of a public official, in violation of the Ohio witness intimidation statute. The Ohio court reversed Mr. Hodge's conviction, holding Mr. Hodge's statements were not actionable under Ohio's witness intimidation statute. *Id.* ¶ 74, 154 N.E.3d at 690. The court explained that there was no evidence that Mr. Hodge intended his threat to discourage the filing of criminal charges or the deputy testifying against him at his trial. There was no evidence that the deputy was, in fact, intimidated or otherwise hindered in the performance of his duties. Mr. Hodge's remarks were not made conditional upon the deputy taking any action. *Id.* ¶¶ 75–76, 154 N.E.3d at 690 (stating "An attempt to influence, intimidate or hinder [the deputy] would involve a quid pro quo: let me go or I will hurt you."); *see also State v. Jackson*, 2003-Ohio-6183, ¶ 18, WL 22725287 (Nov. 20, 2003) (requiring "nexus" between threats and purpose of discouraging witness and holding that because there was no evidence statements were made to discourage filing charges or testimony, defendant's statements "tell Sheila I'm going to kill her when I get out of here" and that defendant was "going to make her life a living hell when I get out of here" were insufficient to support witness intimidation conviction).

[¶31]   As in *Hodge*, here there was no evidence that Mr. Brown's threats were intended to discourage DB and AB from testifying at the CHINS hearing. There was no evidence indicating that Mr. Brown suggested, explicitly or implicitly, that he would harm DB or AB unless they testified a certain way at the CHINS hearing. Because attempted witness intimidation is a specific intent crime, here as in Ohio, there must be an intent that the threats be made for the purpose of influencing, intimidating or impeding the witness. There is nothing in the record linking Mr. Brown's statements—how would DB or AB feel if he took their kids away, or his right to bear arms, or his Facebook post—to the girls' potential testimony in the CHINS hearing. The jury could not have reasonably concluded that Mr. Brown attempted to intimidate DB and AB in relation to their duty as witnesses.

### *CONCLUSION*

[¶32]   The evidence is insufficient to sustain Mr. Brown's convictions for the specific intent crime of attempted witness intimidation under Wyo. Stat. Ann. § 6-5-305(a). We reverse.